NORTHERN STATES POWER COMPA-
NY, petitioner, Respondent,

v.

MINNESOTA PUBLIC UTILITIES
COMMISSION, Appellant
(C1–82–1131),

and

Minnesota Department of Public
Service, intervenor, Appellant
(C1–82–1131),

Minnesota Office of Consumer Services,
intervenor, Appellant (CX–82–1130),

City of Saint Paul, et al., Intervenors-
Respondents Below,

Minnesota Public Interest Research
Group, intervenor, Appellant
(CX–82–1354).

Nos. CX–82–1130, C1–82–1131
and CX–82–1354.

Supreme Court of Minnesota.

Jan. 27, 1984.

Leonard J. Keyes, St. Paul, Samuel L. Hanson, Briggs & Morgan, Gene R. Sommers, David A. Lawrence, Minneapolis, for respondent Northern States Power Company.

Hubert H. Humphrey, III, Atty. Gen., Karl W. Sonneman, Sp. Asst. Atty. Gen., St. Paul, for appellant Minnesota Public Utilities Com'n.

Rodney A. Wilson, Sp. Asst. Atty. Gen., St. Paul, for appellant Minnesota Dept. of Public Service.

Richard G. Evans, Regina M. Chu, Sp. Asst. Atty. Gen., St. Paul, for appellant Minnesota Office of Consumer Services.

Daniel W. Lass, E. Gail Suchman, Minneapolis, for appellant Minnesota Public Interest Research Group.

Hubert H. Humphrey, III, Atty. Gen., Ellen C. Dubuque, Sp. Asst. Atty. Gen., St. Paul, for amicus curiae State of Minn.

## ORDER

This court having heard and considered en banc the petition for rehearing in the above-entitled matter,

IT IS ORDERED that:

1. The opinion filed herein on December 9, 1983, is hereby withdrawn and the attached opinion is substituted;

2. Except as above indicated, the petition for rehearing is denied;

3. Respondent is not allowed attorney fees on this petition pursuant to Rule 140, Rules of Civil Appellate Procedure.

Heard, considered and decided by the court en banc.

KELLEY, Justice.

As the result of the abandonment of plans to construct the Tyrone nuclear power plant near Durand, Wisconsin, Northern States Power Company (NSP)[1] sustained substantial cancellation losses. In 1970, NSP and NSP–W filed with the Federal Power Commission (now known as the Federal Energy Regulatory Commission or FERC) a "Coordinating Agreement" (CA). Following incurrence of the abandonment losses at the Tyrone plant, NSP and NSP–W filed with FERC an amendment to the CA. The amendment sought to allocate the Tyrone abandonment losses between the two companies. In substance, FERC approved the amendment. Thereafter, NSP instituted this proceeding before the Minnesota Public Utilities Commission (MPUC) to obtain approval of proposed increase in retail rates in Minnesota to recoup the portion of the cancellation losses attributable to its Minnesota customers. The Minnesota hearing examiner, finding that the CA and its amendment established a wholesale rate schedule within the exclusive jurisdiction of FERC and that the parties could not attack the reasonableness of those rates prescribed by FERC, recommended that NSP be allowed to include Tyrone losses as expenses for power purchased. The MPUC reversed the hearing examiner. On appeal to the Ramsey County District Court, the court reversed the MPUC. Various interested parties appeal to this court.[2] Because we conclude that

---

**1.** Two utilities are involved. Respondent Northern States Power Company (NSP) is a Minnesota corporation which supplies electricity to retail and wholesale customers in Minnesota, North Dakota and South Dakota. Because Wisconsin law requires all public utilities conducting business in Wisconsin to be domestic corporations (Wis.Stat. § 196.53 (1979–80)), Northern States Power-Wisconsin (NSP–W) is a wholly owned subsidiary of NSP which provides retail and wholesale service to Wisconsin customers. The two utilities operate an "integrated" system in which transmission facilities are interconnected and operated in synchronism.

**2.** The appealing parties are the Minnesota Public Utilities Commission (MPUC), the Minnesota

the amendment to the CA filed with and approved by FERC established a wholesale rate within the exclusive jurisdiction of FERC, we affirm. The MPUC is required to treat the abandonment losses allocated under the amendment as expenses for power purchased in determining retail rates to be charged Minnesota ratepayers.

During the late 1960's, in response to electric power demand projections, NSP and NSP–W instituted plans for construction of two nuclear power plants in Wisconsin. Because of substantial changes in the electric power demand outlook subsequent to initial projections, the final Tyrone project was to be a single nuclear power plant. Each utility originally had roughly indivisible equal ownership in the project together with other utilities.[3] Since Wisconsin prohibited utility ownership by foreign corporations, NSP–W "bought out" NSP's interest in the project.

In 1977, the Federal Nuclear Regulatory Commission issued a construction permit for Tyrone.[4] NSP–W sought construction approval from the Wisconsin Public Service Commission (WPSC). In a hearing before the WPSC, that commission established three "need tests," at least one of which had to be met by the utility before the WPSC would approve the proposed Tyrone construction. Two of the tests examined the need for the project in light of Wisconsin power demands only. The third test focused on the economic and environmental impact of the project. Subsequently, in rejecting NSP–W's application for certification to build Tyrone, the WPSC found the

company had "failed" all three of the "need tests." Thereafter, the Tyrone project was abandoned. Its abandonment resulted in substantial losses to NSP–W and to NSP.[5] On August 24, 1979, NSP and NSP–W filed with FERC an amendment to the CA. The amendment was designed to allocate Tyrone abandonment costs in accordance with the standard allocation formula used for other costs under the initial CA. Following a hearing at which the MPUC and the Minnesota attorney general's office intervened, the federal administrative law judge on December 4, 1980, approved the amendment to the CA. *See* 13 [Oct–Dec 1980 Transfer Binder] FERC (CCH) ¶ 63,-049 (1980). His decision was affirmed by FERC in December 1981. *See* 17 [Oct-Dec 1981 Transfer Binder] FERC (CCH) ¶ 61,-196 (1981). The MPUC and the South Dakota Public Utilities Commission appealed to the United States Eighth Circuit Court of Appeals. That court affirmed FERC's approval of the amended CA. *See South Dakota Public Utilities Commission v. Federal Energy Regulatory Commission,* 690 F.2d 674 (8th Cir.1982).

In this action, NSP is attempting to have its retail ratepayers in Minnesota pay for the Minnesota proportionate share of NSP's expense arising out of the Tyrone abandonment. In essence, NSP claims that FERC's approval of the amended CA resulted in the establishment of an interstate wholesale rate. Therefore, it asserts, the MPUC must allow NSP to pass the Tyrone losses through to retail ratepayers.[6] The

Office of Consumer Services (MOCS), the Minnesota Department of Public Service (MDPS), and the Minnesota Public Interest Research Group (MPIRG). For convenience, these parties will be referred to collectively as appellants.

**3.** Other utilities with an ownership interest were: Cooperative Power Association (17.4%), Dairyland Power Cooperative (13.0%) and Lake Superior District Power Company (2.0%).

**4.** The Nuclear Regulatory Commission must issue a license before construction may commence on a nuclear facility. After that license is issued, the utility must secure, in addition, construction approval from the relevant state regulatory bodies.

**5.** In 1970, NSP and NSP–W had entered into a Coordinating Agreement which was filed with the Federal Power Commission (now known as the Federal Energy Regulatory Commission or FERC). In essence, under the CA filed in 1970, NSP and NSP–W shared the systemic cost of power generation in a ratio roughly proportionate to ultimate use by the customers of each. Such costs were roughly allocated 87% to NSP and 13% to NSP–W. Thus, abandonment losses were sustained by NSP, even though it had "sold" its individual interest in the Tyrone plant.

**6.** NSP is seeking to "pass through" the Tyrone losses to retail ratepayers in the four states where it has retail customers. After the North Dakota Public Service Commission refused

appellants, on the other hand, contend that the Wisconsin Public Service Commission decision which led to the abandonment was a "parochial" one based on considerations of Wisconsin needs alone. More importantly, appellants assert that FERC's approval of the amended CA was merely an allocation of costs between NSP and NSP–W and that, therefore, FERC's approval did not preempt the MPUC's authority to review expenses allocated by the amended CA for the purpose of retail ratemaking.

If the amended CA constitutes a FERC-approved wholesale rate, the MPUC has no power to reexamine the reasonableness of the costs underlying the wholesale rate.[7] On the other hand, if the amended CA was merely a loss allocation between the two utilities, NSP's Tyrone loss is not necessarily a proper expense for purchased power. In such case, the MPUC has the authority to determine that either the retail ratepayers or NSP shareholders will bear the loss. *See* 16 U.S.C. § 824(b)(1) (1982); Minn.Stat. § 216B.03 (1982). *Cf. Minneapolis Street Railway Co. v. City of Minneapolis*, 251 Minn. 43, 86 N.W.2d 657 (1957) (street railway abandonment costs).

■ We commence by noting our scope and standard of review in a rate case.[8] We presume the agency's decision (here, the decision of the MPUC) is correct, but the court may reverse an agency decision if the decision was affected by an error of law. *See Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824–25 (Minn.1977); *Resident v. Noot*, 305 N.W.2d 311, 312 (Minn.1981); *State ex rel. Spurck v. Civil Service Board*, 226 Minn. 240, 249, 32 N.W.2d 574, 580 (1948).

■ NSP and NSP–W are engaged in the transmission and sale of electricity in interstate commerce. They are, therefore, subject to regulation by both state and federal agencies. State utilities commissions may regulate only intrastate wholesale and retail rates for the sale of power to consumers but have no regulatory power over wholesale interstate transactions. *Public Utilities Commission of Rhode Island v. Attleboro Steam & Electric Co.*, 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 54 (1927). In 1935, the United States Congress enacted the Federal Power Act.[9]

---

NSP's application, the North Dakota Supreme Court ruled that the FERC order approving the amended CA precluded that state's regulatory agency from examining the matter further. *See Northern States Power Co. v. Hagen*, 314 N.W.2d 32 (N.D.1981). Thereafter, North Dakota rates reflecting Tyrone losses began on January 17, 1982. South Dakota, by order of the public utilities commission dated April 27, 1983, has agreed to allow recovery of the amortization calculated for the period commencing October 1, 1981. Wisconsin rates reflecting Tyrone losses were effective April 21, 1981.

7. *See Montana-Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246, 251–52, 71 S.Ct. 692, 695, 95 L.Ed. 912 (1951). The court there said:

> To reduce the abstract concept of reasonableness to concrete expression in dollars and cents is the function of the [Federal Power] Commission [the predecessor of FERC].
>
> \*    \*    \*    \*    \*    \*
>
> We hold that the right to a reasonable rate is the right to the rate which the Commission files or fixes, and that, except for review of the Commission's orders, the courts can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable one.

*See also Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981); *Narragansett Electric Co. v. Burke*, 119 R.I. 559, 381 A.2d 1358 (1977), *cert. denied* 435 U.S. 972, 98 S.Ct. 1614, 56 L.Ed.2d 63 (1978).

8. Minn.Stat. § 14.69 (1982) provides:

> In a judicial review under sections 14.63 to 14.68, the court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:
>
> (a) In violation of constitutional provisions; or
>
> (b) In excess of the statutory authority or jurisdiction of the agency; or
>
> (c) Made upon unlawful procedure; or
>
> (d) Affected by other error of law; or
>
> (e) Unsupported by substantial evidence in view of the entire record as submitted; or
>
> (f) Arbitrary or capricious.

9. The regulatory authority created under the Federal Power Act was transferred to FERC in 1977 with the establishment of the Department of Energy. Department of Energy Organization Act, Pub.L. No. 95–91, § 402; 91 Stat. 565, 583

Section 201 of the Federal Power Act describes the federal-state spheres in utility regulation.[10] In *Federal Power Commission v. Southern California Edison Co.*, 376 U.S. 205, 84 S.Ct. 644, 11 L.Ed.2d 638 (1964), the United States Supreme Court determined that in enacting the Federal Power Act Congress intended to vest exclusive federal authority to regulate interstate wholesale utility rates in the Federal Power Commission (predecessor to FERC). Moreover, that Court indicated Congress intended to draw a "bright line," easily ascertainable, between state and federal jurisdiction making unnecessary a case-by-case analysis. *Federal Power Commission v. Southern California Edison Co.*, 376 U.S. at 215–16, 84 S.Ct. at 651. Thus, FERC's jurisdiction is plenary and extends to all wholesale sales in interstate commerce.[11]

■ On the other hand, the MPUC's jurisdiction is limited to regulation of intrastate retail rates. Minn.Stat. § 216B.03 (1982) provides that the MPUC shall establish "just and reasonable" retail rates. In order to establish "just and reasonable" retail rates, the MPUC must consider the right of the utility and its investors to a reasonable return, while at the same time establishing a rate for consumers which reflects the cost of service rendered plus a "reasonable" profit for the utility. *Narragansett Electric Co. v. Burke*, 119 R.I. 559, 381 A.2d 1358 (1977), *cert. denied* 435 U.S. 972, 98 S.Ct. 1614, 56 L.Ed.2d 63 (1978). To accomplish this purpose, the MPUC must ascertain the operating expenses, or cost of service, of the utility. In general, regulators have allowed recovery of investment and cancellation costs of abandoned projects through rates. Utilities have usually been allowed recovery of annual amoritization expense from ratepayers as a component of total cost of service. Sommers, *Recovery of Electric Utility Losses from Abandoned Construction Projects*, 8 Wm. Mitchell L.Rev. 363, 364 (1982). Therefore, if the amended CA providing that NSP share approximately 87% of the Tyrone losses served to establish a wholesale rate, the MPUC had no jurisdiction to determine the reasonableness of that loss allocation. Accordingly, we must make the legal determination whether the CA, as amended, established such a wholesale rate.

In August 1979, a decision was made to abandon the Tyrone project. In the same month NSP and NSP–W filed with FERC an amendment to the CA which was de-

---

(1977) (codified at 42 U.S.C. § 7172 (Supp. V 1981)).

**10.** Section 201 of the Federal Power Act provides:

(a) It is declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation * * * and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.

(b)(1) The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but * * * shall not apply to any other sale of electric energy * * *.

16 U.S.C. § 824 (1982).

**11.** Appellants contend that FERC's authority over interstate wholesale rates has been modified by *Arkansas Electric Cooperative Corp. v. Arkansas Public Commission*, —— U.S. ——, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983). The United States Supreme Court in *Arkansas Electric* held that a state public utility commission could examine wholesale rates of an interstate electric cooperative because those rates were not required to be regulated by FERC under the Federal Power Act and because, although the Rural Electrification Act did contemplate some review of wholesale cooperative electric rates by the Rural Electrification Administration, the review was intended to be non-exclusive since that Act itself presupposed some state review of wholesale rates of power cooperatives. 103 S.Ct. at 1911–14. The United States Supreme Court also indicated that if Arkansas Electric Cooperative Corporation were not a rural power cooperative, the wholesale rates it charges to its members would be subject exclusively to federal regulation. 103 S.Ct. at 1911. Accordingly, the Court's holding in *Arkansas Electric* is irrelevant to FERC's plenary jurisdiction to regulate interstate wholesale rates of investor-owned utilities.

signed to allocate the Tyrone abandonment costs generally in accordance with the formula used for allocation of other costs pursuant to the original CA.[12] Following the filing of the amendment to the CA and while litigation was proceeding through the federal administrative review procedures culminating finally in *South Dakota Public Utilities Commission v. Federal Energy Regulatory Commission*, 690 F.2d 674 (8th Cir.1982), NSP sought approval to raise retail rates in Minnesota.

The Minnesota hearing examiner conducted extensive hearings. He concluded that the amended CA established a formula wholesale rate. He therefore recommended that NSP be allowed to include the Tyrone losses as expenses of power purchased in the test year.[13] So included, the "expenses" would be passed on to the ratepayer in the form of higher retail rates. The hearing examiner, rejecting the arguments now being advanced by appellants before this court, held that FERC had sole jurisdiction to determine whether NSP had acted imprudently, unwisely, and in disregard of the rights of the public.[14]

On appeal, the MPUC rejected NSP's contention that FERC's order in Docket No. ER79–616 automatically required the MPUC to allow NSP to treat its payments to NSP–W for the Minnesota company's share of the Tyrone losses as a reasonable operating expense to be borne by Minneso-ta ratepayers. By its order, *In re Petition of NSP*, MPUC Docket No. E–002/GR–80–316, the MPUC held that it had exclusive jurisdiction to determine what impact the Tyrone abandonment expenses should have on rates charged to Minnesota ratepayers. It concluded that FERC's approval of the amended CA was not a valid wholesale rate and therefore was not binding on the MPUC. In essence, the MPUC was of the opinion the CA was merely an allocation of costs between the two utilities.

On appeal to the district court pursuant to Minn.Stat. § 216B.52 (1982), the MPUC order was reversed. The district judge relied on the grounds stated by the Supreme Court of North Dakota in *Northern States Power Co. v. Hagen*, 314 N.W.2d 32 (N.D. 1981). The North Dakota court had held the FERC order accepting the amended CA precluded that state's regulatory authority from examining the matter further.[15] The North Dakota court noted that NSP is required by the FERC order to pay a fixed wholesale rate for electricity to NSP–W which includes the amortization of the Tyrone loss. *Hagen*, 314 N.W.2d at 37. It went on to hold that since the North Dakota Public Service Commission had no direct jurisdiction over interstate wholesale rates, it would undermine the supremacy clause and the preemption doctrine for the North Dakota Public Service Commission to indi-

---

12. The final NSP share of the abandonment loss appears to be approximately $67 million. FERC Opinion No. 134, FERC Docket No. ER 79–616, 17 [Oct-Dec 1981 Transfer Binder] FERC (CCH) ¶ 61,196 at 61,379 (December 3, 1981). NSP proposed to allocate its 87% share of the loss 75% to Minnesota and the remainder to North Dakota and South Dakota. It also proposed that, of the 75% assigned to Minnesota, 96.6% would be apportioned to retail customers and 3.4% to wholesale customers.

13. The "test year" is a period of time for which data regarding the company's revenues and expenses are collected and examined. Based on this information, the regulatory body determines a "just and reasonable" rate to be charged for the utility's services. *See generally* 1 A.J.G. Priest, *Principles of Public Utility Regulation* 45 (1969). Since utilities are, of course, allowed to recoup expenses, inclusion of an item as a test year expense will result in a corresponding rate increase. *See generally Mississippi River Fuel Corp. v. Federal Power Commission*, 163 F.2d 433, 437 (D.C.Cir.1947).

14. The Minnesota hearing examiner noted, as did the federal administrative law judge, that appellants' claim that the decision of the Wisconsin Public Service Commission was "parochial" was irrelevant.

15. *Northern States Power Co. v. Hagen*, 314 N.W.2d 32 (N.D.1981), involved the identical issue presented here—whether the North Dakota Public Service Commission in a retail rate proceeding had jurisdiction to reexamine the reasonableness of all of NSP's retail expenses—despite the fact that NSP's amortized abandonment losses, a part of those expenses, were previously allowed as part of the interstate wholesale purchase on the basis of interstate wholesale rates filed with FERC.

rectly assert jurisdiction over the wholesale rates by again investigating the reasonableness of the underlying costs in a proceeding involving retail rates. *Hagen*, 314 N.W.2d at 38.

On this appeal, appellants basically argue that the amended CA simply allocated the abandonment loss between the two companies. Once the loss was placed on the corporate books, then each company independently tried to recoup the loss in any way possible. Thus, appellants claim, the Tyrone loss is not necessarily a proper expense for purchased power but is rather a financial burden which the MPUC has the authority and jurisdiction to force either the ratepayers or NSP shareholders to bear.

FERC accepted the amended CA as a "rate." As to NSP, it denominated it "Rate Schedule No. 375" and as to NSP-W, "Rate Schedule No. 53." Those designations, however, are not necessarily determinative.[16] The definition of "rate schedule" obviously includes wholesale rates but appears broad enough to encompass other subjects.

Appellants rely heavily on wording in the initial decision of the federal administrative law judge to support the contention that the allocation of the Tyrone loss did not establish a wholesale rate. The administrative law judge said:

> [Allocation of Tyrone loss via the CA] may not automatically govern the rate-making consequences either at the federal (resale rates) or state (retail rates) level. In recognition of this, NSP states that it is willing to make such reports and filings which the federal and state regulatory bodies may require, within their jurisdictional authority, to reflect the allocation of the loss between the two NSP Companies in their respective resale and retail rates.

Initial Decision on Nuclear Plant Cancellation Loss, FERC Docket No. ER79–616, 13 [Oct-Dec 1980 Transfer Binder] FERC (CCH) ¶ 63,049 at 65,288 (December 4, 1980) (footnote omitted). NSP answers that appellants draw too much from the federal administrative law judge's language and asserts that this statement is nothing more than a recognition by the administrative law judge that he could not, in fact, dictate ultimate retail rates. That language, standing alone, would tend to dispel any sense that the MPUC would be required to "rubber stamp" the federal allocation decision in a subsequent retail rate hearing.

In a totally separate FERC proceeding, NSP–W sought to raise its wholesale rates to certain full-requirement customers located in Wisconsin. These included a number of municipal corporations to which NSP–W sells power for resale. Part of the requested increase was prompted by an attempt to pass through some of the Tyrone losses. In discussing FERC Docket No. ER79–616 (the FERC case which ultimately approved the amended CA), FERC's opinion characterized the purpose of it as follows:

> The hearing in Docket No. ER79–616 was established to determine: (1) whether the amortization is proper; (2) whether the NSP-Minn/NSP-Wis Coordination Agreement affords a reasonable method of allocating amortization; and (3) whether the length of the amortization period is appropriate.

Northern States Power Company (Wisconsin), Docket No. ER80–181, 10 [Jan-March 1980 Transfer Binder] FERC (CCH) ¶ 61,223 at 64,421 (March 7, 1980).

However, FERC later commented on the effect of the amended CA in its order denying rehearing and request for summary disposition and dismissal of a subsequent amendment to the CA. Northern States Power Company (Minnesota), Docket No.

---

**16.** When FERC uses the term "rate," it uses the definition found in 18 C.F.R. § 35.2(b) (1983) as follows:

> *Rate Schedule.* The term "rate schedule" as used herein shall mean a statement of (1) electric service as defined in paragraph (a) of

this section, (2) rates and charges for or in connection with that service, and (3) all classifications, practices, rules, regulations or contracts which in any manner affect or relate to the aforementioned service, rates, and charges.

ER83-89-001, 23 [April-June 1983 Transfer Binder] FERC (CCH) ¶ 61,026 (April 6, 1983). In that case, NSP filed an additional amendment to the CA affecting NSP, NSP-W and Lake Superior District Power Company. The purpose of this amendment was to modify the methodology used in calculating fixed charges shared among the three companies. The MPUC and the Minnesota attorney general intervened, claiming, as here, that the amended CA was merely a cost allocation device and not a wholesale rate. In rejecting that contention, the FERC order stated:

> [T]he coordinating agreement does establish rates and charges, albeit through formula rates, for the use of generation and transmission facilities which have been dedicated to coordinated operation. * * *
>
> The [CA] establishes the means by which the interstate transfer of power between the companies occurs and the intercompany charges for such transactions. * * *
>
> By making a determination as to the appropriate return on equity established by [the CA], we are not purporting to establish the return for retail rates. Our determination will only affect retail rates to the extent that the state is required to treat the allocated costs as expenses for purposes of determining the retail rates. Such a situation is not unique and is typical to the entire wholesale-retail regulatory process.

*Id.* at 61,066. Thus, it seems clear to us that by FERC's own expression in these cases it considered the approval of the amendment to the CA as establishing a formula wholesale rate, the reasonableness of which cannot be relitigated in a retail rate proceeding before a state utilities commission.

■ Appellants further contend that the amendment to the CA cannot be a FERC-approved wholesale rate because, they claim, FERC has no power to alter a rate retroactively. In the instant case, NSP's amendment to the CA was filed with FERC on August 24, 1979. By the terms of the filing and under the final FERC order, the amendment was effective as of March 6, 1979, the date of the Tyrone abandonment. Appellants here claim that since FERC gave the amended CA retroactive effect, such fact demonstrates it cannot be a wholesale rate. The statute, 16 U.S.C. § 824d(d) (1982), provides that FERC may waive the requirement that rates become effective in futuro. *See City of Piqua, Ohio v. Federal Energy Regulatory Commission*, 610 F.2d 950, 952-54 (D.C.Cir. 1979). We conclude the retroactivity of FERC's order amending the CA does not preclude it from establishing a wholesale rate.

Next, appellants contend that under the terms of the amended CA there is no "sale for resale," and, therefore, it cannot constitute a wholesale rate. Under the Federal Power Act, the sale of energy at wholesale requires a "sale of electric energy to any person for resale." 16 U.S.C. § 824(d) (1982). Appellants argue that since NSP-W has no substantial baseload capacity—generating plants—in Wisconsin, there cannot be wholesale sales from NSP-W to NSP. In this connection, appellants also contend there is no "separate transaction," which is the hallmark of a wholesale sale. *United States v. Public Utilities Commission of California*, 345 U.S. 295, 318, 73 S.Ct. 706, 719, 97 L.Ed. 1020 (1953). They suggest that the occurrence of any "sale" is existentially denied because the amount of "sales" and "rates" at which they are made cannot be determined from the amended CA. Finally, they contend there is no wholesale transaction because payments under the amended CA are discretionary—that is, there is no "fixed" rate.[17]

17. The MPUC and the Minnesota Department of Public Service contend, in addition, that inasmuch as the Tyrone costs were incurred by NSP-W, a subsidiary of NSP, they are affiliate costs and that the MPUC has jurisdiction to question the propriety of those costs. In so doing they rely on telephone rate cases *Smith v. Illinois Bell Telephone Co.*, 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255 (1930), and *Northwestern Bell Telephone Co. v. State*, 299 Minn. 1, 216 N.W.2d 841 (1974). Without dispute, the MPUC may question the propriety of transactions between

We acknowledge that electricity is a fungible commodity. It is difficult, if not impossible, in an integrated and synchronized electrical power system to determine the precise source of an electrical flow. It is clear that FERC's jurisdiction is broad enough to govern "sales" without the need to resort to tracing the source and end use of electricity. It is sufficient that some electrical power conceivably flows in interstate commerce in the form of a wholesale sale. *See Federal Power Commission v. Florida Power & Light Co.*, 404 U.S. 453, 466–69, 92 S.Ct. 637, 645–47, 30 L.Ed.2d 600 (1972). Thus, the location of baseload generating plants is not critical. Moreover, NSP–W does generate electricity in Wisconsin so "sales" could occur from NSP–W to NSP, even if they are not detected at a particular instant in time.[18] Finally, we note a formula rate as established by a CA is just as much a rate as any other kind of rate. We conclude, therefore, appellants' argument that the amended CA does not establish a "sale for resale" and therefore cannot constitute a wholesale rate is without merit.

■ We hold that FERC's approval of the amended CA constituted the establishment of a wholesale rate. While that determination does not directly establish the return for retail rates, which is in the exclusive jurisdiction of the MPUC, the state utilities commission is required to treat the allocated abandonment costs as expenses for power purchased in determining the retail rates. Accordingly, we affirm the order and judgment of the district court.

Affirmed.

affiliated companies which are not otherwise subject to federal regulation in the area. However, such is not the case when considering wholesale power rates under the jurisdiction of FERC. Congress recognized in enacting the Federal Power Act, 16 U.S.C. §§ 791a–825r (1982), and the Public Utility Holding Company Act of 1935, 15 U.S.C. §§ 79–79z–6 (1982), that affiliate power transactions "are not susceptible of effective control by any State." 15 U.S.C. § 79a(a) (1982). *Narragansett Electric Co. v. Burke*, 119 R.I. 559, 381 A.2d 1358 (1977), *cert. denied* 435 U.S. 972, 98 S.Ct. 1614, 56 L.Ed.2d 63 (1978), in fact, involved wholesale transactions

between affiliated companies. Transactions, such as this one, between affiliated power companies appear to be precisely the type of transactions that Congress sought to regulate by enactment of the Federal Power Act and the Public Utility Holding Company Act of 1935.

18. For example, NSP–W's capacity includes a certain amount of hydro-power generating capacity. Since hydro-power is a very low cost option, it is presumably used very often, though it is not technically considered a baseload facility.