In the Matter of the Contested Case of
**LAURA BAKER SCHOOL
ASSOCIATION, Relator,**

v.

**DEPARTMENT OF HUMAN
SERVICES, Respondent.**

**No. C8–85–833.**

Court of Appeals of Minnesota.

Nov. 19, 1985.

Review Granted Jan. 23, 1986.

Curtis D. Forslund and Lynne E. Stanley, Minneapolis, for relator.

Hubert H. Humphrey, III, Atty. Gen., Deborah L. Huskins, Sp. Asst. Atty. Gen., St. Paul, for respondent.

Heard, considered and decided by POPO-VICH, C.J., and WOZNIAK and HUSPE-NI, JJ.

## OPINION

WOZNIAK, Judge.

Relator Laura Baker School Association brought a writ of certiorari seeking review of a decision by the Commissioner of Human Services in which the Commissioner ruled that the School was subject to the Department of Human Services' need determination process prior to seeking certification from the Department of Health as an intermediate care facility for the mentally retarded. The Commissioner further found that the Department did not unreasonably fail to exercise its authority in making a need determination prior to June 10, 1983, when the statutory moratorium on certification of intermediate care facility beds for the mentally retarded went into effect. The Department of Human Services refused to make a determination of need because of the moratorium. We reverse and remand.

## FACTS

The Laura Baker School Association (School) is a nonprofit corporation. It provides educational and residential services to mentally retarded persons at its facilities in Northfield, Minnesota, serving children and adults in approximately equal numbers. The adult residents are semi-independent, require limited supervision, and are able to work in sheltered employment or attend developmental achievement centers. School age residents function at a lower level, and tend to be severely or profoundly retarded and have other medical problems.

The School was founded in 1897, and has been licensed ever since the state began licensing such facilities. It is licensed as a supervised living (residential) facility for mentally retarded persons. It is now licensed by the Department of Human Services (DHS) for 73 residents under Minn.R. 9525.0210–.0430 and by the Minnesota Department of Health (DOH) under Minn.R. ch. 4665. Presently, 337 facilities are licensed under these rules. All but four are also certified as intermediate care facilities for mentally retarded persons (ICF/MR) by the DOH. The School is one of the four which is not certified as ICF/MR. In Minnesota, ICF/MRs provide approximately 7,489 beds for mentally retarded persons, about 2,200 of which are located in state hospitals.

In 1978, the School began planning a building improvement program. In 1979, Rice County welfare officials suggested that the School become certified as an ICF/MR, which would make the county eligible for federal medical assistance funds for the costs of resident care. The building program was adopted, resulting in the construction of two new residential buildings which housed sixteen residents each, and a food service building. The construction was completed prior to April 27, 1983. These improvements were designed to meet the requirements for ICF/MR certification.

In late August 1982, School officials began making inquiries regarding ICF/MR

certification, and had preliminary contacts with the DOH. Sometime in March 1983, Paul Hermanson, the School's accountant, obtained the necessary application form. He believed that the School was required to submit it for DHS approval so that the School could be certified as an ICF/MR. He telephoned DHS several times in April 1983; each time he was told he would have to speak to Ardo Wrobel, the director of the mental retardation program division. Wrobel was sick from the end of March through April 21, 1983. On April 22, 1983, Wrobel returned Hermanson's call, and a meeting was scheduled for April 27 to discuss the School's application for certification as an ICF/MR.

On April 27, School representatives met with DHS personnel. The School's application was filed with the Department at that time. The application was accompanied by a November 9, 1982 letter to the School on behalf of the county board, reiterating the County's support for the building program and expressing the Board's hope that "the necessary requirements for Title XIX eligibility are being made."

On February 11, 1983, the Legislative Auditor's office issued an evaluation of community residential programs for mentally retarded persons, and recommended that alternatives to ICF/MRs be made available and used, and that development of new ICF/MRs be limited. On February 14, 1983, a bill, which DHS helped draft, called for a moratorium on the licensure of new intermediate care beds and a statewide limitation on certified ICF/MRs. In late February or early March 1983, the Department adopted an internal administrative moratorium on the approval of additional ICF/MR beds. The moratorium was not promulgated as a rule. After the moratorium was adopted, no applications for need determinations were approved and none were recommended for approval.

However, DHS continued to process applications for need determinations. In anticipation of legislative action, the mental retardation program division and the Tri-Divisional (3–D) Committee, which reviews applications for need determinations, delayed final action on completed applications for 30 days to determine whether the legislation passed during the interim. A 30-day time limit was used for applications from existing facilities because DHS had a duty, under existing rules, to consider applications from new, unlicensed facilities within a 30-day period. At the expiration of the 30-day period, applications were denied on the basis of the administrative moratorium if DHS's legislation had not yet been considered by the legislature.

On April 29, 1983, the 3–D Committee discussed the School's application. The committee agreed that the building improvements made by the School should be approved for purposes of Minn.R. 9525.0230 but, notwithstanding Rice County's letter of November 9 supporting the application, directed that the application be returned to Rice County for comment on the School's ICF/MR certification; the members agreed that no other action on the ICF/MR certification should be taken at that time. Almost two weeks later, on May 12, 1983, a letter was sent to the County requesting comment on the certification.

On May 12, 1983, the 3–D Committee held its next regularly scheduled meeting. At that meeting, the committee recommended approval of the School's buildings, but not its certification as an ICF/MR facility. On May 19, 1983, the committee received a reply letter from the county supporting the School's application for ICF/MR certification. On May 26, 1983, the 3–D Committee held its next regularly scheduled meeting. While no further action was required by the School, the Committee determined that no immediate action was required on the School's application, and none was recommended. It delayed acting because it claimed its informal 30-day period for final action had not yet run; the DHS staff felt it would be imprudent to approve new ICF/MR beds during the 30-day period because of the Department's pending legislation and its conclusion that

only 7,500 certified ICF/MR beds were needed in the state.

On June 10, 1983, a statutory moratorium on the approval of new intermediate care facilities and capacity increases in existing facilities went into effect. On July 1, 1983, a statutory limitation on certified ICF/MR beds also became operative. It limited the total number of certified ICF/MR beds in the state to 7,500.

On September 2, 1983, the 3–D Committee recommended that the School's application for an ICF/MR determination of need not be granted because of the statutory moratorium on new ICF/MRs and limitations on the number of certified ICF/MRs. On September 21, 1983, the board and the School were notified that the School's application for a change to an ICF/MR classification was denied, but that its program was approved. The denial was based on 1983 Minn.Laws ch. 312, art. 9, § 3 (adding Minn.Stat. § 252.291, subd. 1), imposing a moratorium on new intermediate care beds and establishing a limitation on the number of certified ICF/MR beds.

The School filed notice of an administrative appeal and an administrative law judge was named to hear the appeal. The administrative law judge issued findings of fact and conclusions of law, and recommended that the Commissioner of Human Services notify the Department of Health: (1) that the School had all the necessary licenses and need determinations required from DHS; (2) that the School needed no further approval from DHS to be certified as an ICF/MR; (3) that the School required no need determination from DHS prior to June 10, 1983, for its buildings, its programs, or its ICF/MR certification; (4) that the School erroneously requested a need determination for ICF/MR status on April 27, 1983; (5) that DHS will cooperate with DOH to maximize certification of the School's beds by decertifying as many state hospital beds as possible, consistent with the needs of mentally retarded persons in the state and the statutory limitation on ICF/MR certifications; and (6) that the

School's beds should be certified as ICF/MR consistent with item 5.

The respondent did not act on the decision within the time allotted by law, and, on the application of the School, this court on April 2, 1985, issued a writ of mandamus requiring DHS to issue its order and decision. On April 9, 1985, the respondent accepted the findings of fact of the administrative law judge, rejected some conclusions of law, and rejected all recommendations except the first.

The School petitioned for writ of certiorari, and we now review the matter.

## ISSUES

1. Was Laura Baker School Association required to obtain a determination of need from the Minnesota Department of Human Services prior to seeking certification from the Department of Health as an intermediate care facility for the mentally retarded?

2. Was the administrative moratorium on granting determinations of need adopted by the Department of Human Services illegal?

3. Does the legislative moratorium preclude the School from applying to the Department of Health for certification?

4. Is the School entitled to a determination of need under the exception in Minn. Stat. § 252.291, subd. 2(b)?

## ANALYSIS

Relator filed a writ of certiorari to obtain review of a final decision in a contested case. Minn.Stat. § 14.63 (1984). Under the Administrative Procedure Act:

the court may affirm the decision of the agency or remand the case for further proceedings; or it *may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced* because the administrative finding, inferences, conclusion, or decisions are:

(a) In violation of constitutional provisions; or

(b) In excess of the statutory authority or jurisdiction of the agency; or

(c) Made upon unlawful procedure; or

(d) Affected by other error of law; or

(e) Unsupported by substantial evidence in view of the entire record as submitted; or

(f) Arbitrary or capricious.

Minn.Stat. § 14.69 (1984) (emphasis added). An agency's decision is presumed correct, but this court may reverse if that decision was affected by an error of law. *Northern States Power Co. v. Minnesota Public Utilities Commission*, 344 N.W.2d 374, 377 (Minn.), *cert. denied* — U.S. ——, 104 S.Ct. 3546, 3547, 82 L.Ed.2d 850 (1984). This is such a case.

■ Relator has the burden of proving that the agency violated one or more of the provisions of Minn.Stat. § 14.69. *See Minnesota Loan & Thrift Co. v. Commerce Commission*, 278 N.W.2d 522, 525 (Minn. 1979).

1. The first issue in this case is whether DHS was authorized or required to make a determination of need before the School could seek certification from DOH as an ICF/MR. The School seeks to be certified as an ICF/MR for participation in the medical assistance program under Title XIX of the Social Security Act 42 U.S.C. §§ 1396a– q. In order to be certified, a facility must meet federal standards set forth in 42 C.F.R. § 442.400–.516. Under these federal regulations, certification decisions are made by the Secretary of Health and Human Services or by a state survey agency. *Id.* § 442.101(b), (c). In Minnesota, the designated agency is the Department of Health.

The need determination at issue here is required by state law and DHS rules. At the time of the School's application for a determination of need, the relevant law provided:

> The commissioner of public welfare may determine the need, location, and program of public and private residential and day care facilities and services˙for mentally retarded children and adults.

Minn.Stat. § 252.28, subd. 1 (1982). DHS (then the Department of Public Welfare) promulgated rules to govern the planning and provision of residential programs and services to mentally retarded individuals. Minn.R. 9525.0210–.0430 (1983).

Need determination is defined in the rules as:

> the determination by the commissioner of need, location, and program of public and private residential and day care facilities and services for mentally retarded children and adults, Minnesota Statutes, section 252.28, subdivision 1.

Minn.R. 9525.0010, subpt. 12 (1983). The rules provide the procedure which must be followed when a proposed facility or service seeks a need determination, and factors which the commissioner considers in making the final determination. Minn.R. 9525.0080, subpts. 2, 3, 4. Subpart 5 provides:

> Within 30 days of receipt of the applicant information and recommendation of the county board, the applicant and county board shall be notified of the commissioner's decision. The notice of the commissioner's decision shall contain notice of the right to appeal that decision, pursuant to subpart 7. *If approved the licensing division of the state agency shall then act upon a license application, and the applicant may seek certification under title XIX and other funding resources from the state agency.*

Minn.R. 9525.0080, subpt. 5 (1983) (emphasis added). That is, once the facility is approved in a determination of need, the licensing division acts upon the license application, and the facility may seek certification.

The provision governing changes in an already licensed facility, such as the School, does not require that a need determination be made prior to the facility seeking certification:

> If a licensed facility requests an increase or decrease in licensed capacity, or *change in program of any facility or service, that may require change in staffing or remodeling,* the facility shall apply to the commissioner directly. No

change shall be granted until the county board has an opportunity to comment. The commissioner shall notify the county board of such a request by sending a copy of the request to the county board. The county shall have 30 days to comment. The commissioner shall use the same criteria as is specified for original applications.

Minn.R. 9525.0080, subpt. 6 (1983) (emphasis added).

■ DHS quotes the certification language in subpart 5, contending that its determination of need is a prerequisite to the School seeking DOH approval for participation in the federal program. However, the prerequisite is applicable only to new facilities. The clear language of the rule in subpart 6 for already licensed facilities does not include any reference to certification, and we are unwilling to read such a requirement into subpart 6. DHS itself, in a later portion of its brief, contends that another requirement in subpart 5, the requirement that it act on an application for a new facility within 30 days, does not apply to a licensed facility, because that time limit is not explicitly stated in subpart 6.

There is no provision in the rules that an already licensed facility must obtain a determination of need prior to applying for certification for purposes of federal funding. If DHS has such a rule, it is one which was not promulgated in accordance with the APA. *See* Minn.Stat. ☒ 14.-131–.365 (rulemaking procedures). Any such rule is illegal for failure to comply with the APA, and we refuse to give it effect. *White Bear Lake Care Center, Inc. v. Minnesota Department of Public Welfare,* 319 N.W.2d 7, 9 (Minn.1982).

■ The parties and the ALJ have addressed extensively the issue of whether certification itself constitutes a change in program, requiring a determination of need. DHS contends that certification is a change in program that may require a change in staffing or remodeling. It argues that the extensive regulations which the school would be required to comply with as a requirement for participating in

the federal program affect the School's program.

DHS appears to be seeking a determination that certification constitutes a change in program as a matter of law. We will not make such a ruling. In addition, the ALJ noted in his memorandum that there was no evidence in the record that the School made any changes in its program or capacity to meet ICF/MR certification standards.

Finally, the rules explicitly state that once a facility is licensed, it may apply for certification. While most facilities apparently apply for certification shortly after they are licensed, nothing in the rules precludes a licensed facility from applying for certification sometime after it is licensed.

DHS contends that Department personnel have consistently interpreted ICF/MR certification of an existing facility as a change in program. It quotes the Minnesota Supreme Court:

As a general rule, this court defers to an agency's interpretation [of its own rule] when the language subject to construction is so technical in nature that only a specialized agency has the experience and expertise to understand it, when the language is ambiguous or when the agency interpretation is one of long standing. We do not defer when the language employed or the standards delineated are clear and capable of understanding.

*Resident v. Noot,* 305 N.W.2d 311, 312 (Minn.1981) (citations omitted).

As noted earlier, 333 out of 337 facilities are certified as ICF/MR. The two facilities which in 1981 requested certification applied for a need determination. However, the fact that the two other facilities applied for a determination of need at the time they requested certification does not amount to an interpretation of long standing by DHS. Further, as discussed above, we find that the rule is clear and unambiguous: a facility may seek certification after it is licensed. DHS erred in finding that the School was required to obtain a deter-

mination of need from DHS before it could apply to DOH for certification.

■ 2. The School also contends that DHS deliberately delayed acting on its application based on the illegal moratorium. The ALJ had concluded that the informal moratorium adopted by DHS was invoked to deny the School's application for a determination of need. Because the Commissioner of Human Services had, in a previous ruling in another application, determined that the moratorium did not violate the rulemaking provisions of the Administrative Procedure Act, the ALJ felt bound by that decision.

The administrative moratorium adopted by DHS was illegal. The moratorium is clearly within the statutory definition of a rule:

> "Rule" means every agency statement of general applicability and future effect, including amendments, suspensions, and repeals of rules, adopted to implement or make specific the law enforced or administered by it or to govern its organization or procedure.

Minn.Stat. § 14.02, subd. 4 (1982). In the case of the moratorium, DHS adopted a new policy for determinations of need. Rather than considering the various factors set out in Minn.R. 9525.0080, it instead adopted a flat rule that no determinations of need would be issued. When a rule such as this is not adopted according to the procedures set out in the APA, Minn.Stat. §§ 14.131–.365, the rule will be invalidated. *White Bear Lake Care Center*, 319 N.W.2d at 9.

The result of the application of the administrative moratorium was that the School was precluded from applying for certification until after the legislative limitation on certified beds and the legislative moratorium came into effect.

■ 3. The School was denied a determination of need on the basis of the legislative moratorium. As we held earlier, DHS had no authority to make a determination of need under the previous law. The moratorium provides:

> Notwithstanding section 252.28, subdivision 1, or any other law or rule to the contrary, the commissioner of public welfare shall deny any request for a determination of need and refuse to grant a license pursuant to section 245.782 for any new intermediate care facility for mentally retarded persons or for an increase in the licensed capacity of an existing facility except as provided in subdivision 2. In no event shall the total of certified intermediate care beds for mentally retarded persons in community facilities and state hospitals exceed 7,500 beds as of July 1, 1983, and 7,000 beds as of July 1, 1986. "Certified bed" means an intermediate care bed for the mentally retarded certified by the commissioner of health for the purposes of the medical assistance program under United States Code, title 42, sections 1396 to 1396p, as amended through December 31, 1982.

Minn.Stat. § 252.291, subd. 1 (Supp.1983).

The law precludes the commissioner from granting any request for a determination of need and license for any "new" facility, or for an increase in the licensed capacity of an existing facility. The School is not a new facility applying for a determination of need, nor is it seeking an increase in its licensed capacity. Consequently, the moratorium law which was used as a basis for denying the School's request for a determination of need has no impact on the School's attempt to obtain certification from DOH.

4. The School also argued that it is entitled to a determination of need for certification under the exception in Minn.Stat. § 252.291, subd. 2(b) (1984). Based on our holding above, we need not address this issue.

### DECISION

The School was not required to obtain a determination of need from DHS, and DHS improperly determined that certification of a facility as an ICF/MR is a change in program. The administrative moratorium was illegal, and was used to delay acting

upon the School's application until the legislative moratorium came into effect.

The Department of Human Services has no authority to prevent the School from applying for certification with the Department of Health. The School may apply to the Department of Health for consideration of its request for certification as an intermediate care facility for the mentally retarded.

Based upon our analysis herein, the Department of Health should consider the request for certification based upon existing law as of the date of the original application, i.e., April 27, 1983.

Reversed and remanded.