OPINION OF THE COURT
 

 Smith, J.
 

 In July 1993, the Public Service Commission (PSC) reduced the permissible utility rate Rochester Telephone Corporation (RTC) could charge its ratepayers by imputing revenue to RTC in the form of a 2% royalty arising out of improper cost-shifting
 
 *25
 
 and uncompensated transfers of RTC’s intangible assets between RTC and its subsidiaries and affiliates. PSC also created a rebuttable presumption of a 2% royalty in the future for other regulated utilities. The issue presented to this Court is whether the Appellate Division erred in confirming the actions of the PSC. We affirm the Appellate Division because we conclude that the royalty and the rebuttable presumption are rational means for achieving just and reasonable utility rates.
 

 In 1983, staff members of the Department of Public Service proposed imputing revenues to RTC in the form of a royalty to compensate ratepayers for the free transfer of intangible assets to RTC’s affiliate, Rotelcom, and improper cost shifting from Rotelcom to RTC. PSC called for hearings on the need for and the propriety of levying such a royalty. After the completion of hearings in June 1985, the Administrative Law Judge concluded that PSC had the legal authority to impose a royalty.
 

 In 1990, PSC reopened the record to receive additional evidence on the propriety of imposing a royalty on RTC based on RTC’s dealings with its subsidiaries and affiliates, and the appropriate level of such a royalty. Although the proceedings focused primarily on RTC, other utilities, at PSC’s invitation, participated in the hearings and filed written submissions. In July 1993, after a series of hearings in 1990 and 1991, PSC issued opinion No. 93-11 which imposed a 2% royalty on RTC and created a rebuttable presumption of a 2% royalty for rate-making purposes whenever a utility invests in competitive enterprises. PSC also announced that no general challenges to the royalty presumption would be entertained in future individual rate proceedings, although utilities would be able to challenge the application of that presumption to their particular cases. Various requests for a rehearing, clarification and stay of opinion No. 93-11 were denied by the PSC in opinion No. 93-11 (A).
 

 RTC filed a CPLR article 78 proceeding, in which various interested utilities intervened, questioning PSC’s authority to levy a royalty and challenging the royalty as an irrational means of achieving State interests. Appellants also raised various State and Federal constitutional issues, including claims that the royalty violated the Commerce Clause and constituted an unlawful taking. Appellants’ petition, originally filed in Supreme Court, was transferred to the Appellate Division at appellants’ request.
 

 The Appellate Division confirmed the PSC determinations and held that the 2% royalty fell within PSC’s broad authority
 
 *26
 
 to determine just and reasonable rates, and that the royalty was a rational means of exercising that authority. Consequently, PSC’s authority to apply a 2% royalty to RTC and the rebuttable presumption to other utilities was confirmed. The Appellate Division also rejected appellants’ constitutional claims, holding that the PSC actions did not violate the Commerce Clause, equal protection, due process of law or constitute an unlawful taking. Appellants’ petition was dismissed.
 

 On July 29, 1994, appellants filed a notice of appeal as of right on constitutional grounds, pursuant to CPLR 5601 (b) (1), and, alternatively, moved for leave to appeal to this Court. Three trade associations also sought to appear as
 
 amici curiae
 
 in support of the motion for leave to appeal. On December 8, 1994 we retained the appeal, denied the motion for leave as unnecessary, and granted the
 
 amici
 
 motion.
 

 Shortly before we decided to retain this appeal, PSC issued an order, effective as of November 10, 1994, approving a Joint Stipulation and Agreement (Joint Stipulation) between the Department of Public Service staff and RTC.
 
 [1]
 
 The Joint Stipulation implemented a corporate restructure for RTC, established a multiyear rate plan from January 1, 1995 through December 31, 2001 and enhanced the competitive market in the Rochester area. The parties also agreed that,
 

 "All outstanding revenue requirement issues including * * * the royalty issue that is the subject of an Article 78 proceeding
 
 (Rochester Telephone Corp. v. Public Service Comm’n,
 
 A.D. No. 69820 (3d Dep’t), are resolved without further adjustment, except, with respect to the royalty issue, as provided below. Except as already reflected in this Agreement, neither RTC (which will be R-HC) nor R-Net shall have imputed a royalty, as described in [opinion No. 93-11] * * * Issued and Effective July 6, 1993, by the Commission for the period covered by this Agreement, or for any prior period, except as set forth in paragraphs I.E.4. Upon the termination of the rate plan period, nothing prevents the Commission, subject to the outcome of the Article 78 proceeding referred to above, from imputing a royalty for the period beginning on the termination date.”
 

 By motion returnable March 13, 1995, PSC argued to this Court that this appeal should be dismissed as nonjusticiable
 
 *27
 
 because the Joint Stipulation fixed the rates which RTC could charge its customers through the year 2001, regardless of the outcome of the appeal. PSC also argued that the appeal was not justiciable as to the remaining appellants because no utility except for RTC had been ordered to pay a royalty. Appellants opposed the motion to dismiss on the ground that the Joint Stipulation, by its "subject to the outcome of the Article 78 proceeding” language, completely resolved all outstanding revenue issues except for the royalty. Appellants also argued this appeal presented a justiciable controversy over PSC’s general authority to impose a royalty. Appellants further argued that because opinion No. 93-11 precluded any further challenge to the royalty imputation policy, they would be foreclosed from seeking review of PSC’s general exercise of authority in any other forum. We denied the motion to dismiss the appeal without prejudice to renewal of the motion upon oral argument. At oral argument, PSC renewed its motion to dismiss this appeal.
 

 PSC did not approve the Joint Stipulation until after the Appellate Division rendered its judgment. Consequently, the rationality and constitutionality of PSC’s opinions Nos. 93-11 and 93-11 (A) were properly before the Appellate Division. We must now decide whether this appeal is properly before this Court.
 

 We cannot agree with appellants that the Joint Stipulation resolved all revenue issues except for the royalty. The clear language of the Joint Stipulation reserves PSC’s right to impose a royalty after the termination of the rate period on December 31, 2001. Consequently, the outcome of this article 78 proceeding becomes relevant only after the Joint Stipulation expires. Nothing indicates that the parties intended to adjust the utility rates set from January 1995 through December 2001 to conform with the outcome of this appeal.
 

 Even if some aspects of a controversy have become nonjusticiable through a change in conditions,
 

 "Review is still appropriate if substantial questions remain, on which an effective disposition can be made * * * If a case is academic, but for the award of costs below, the appeal will be dismissed nevertheless. But if, in any other substantial way, any rights of the parties can be affected by the decision, the determination is a reviewable one in so far as it is necessary to determine those rights” (Cohen and Karger, Powers of the New York Court of Appeals § 98, at 417 [rev ed] [n omitted]).
 

 
 *28
 
 Although the Joint Stipulation resolved the propriety of PSC’s application of the 2% royalty to RTC’s case through December 31, 2001, we conclude that a justiciable controversy exists as to PSC’s general authority to order payment of a 2% royalty based upon a utility’s relationship with its subsidiaries and affiliates. An article 78 proceeding is the proper avenue to obtain review of a PSC ruling allegedly beyond its authority
 
 (Matter of Public Serv. Commn. v Rochester Tel. Corp.,
 
 55 NY2d 320, 325). Issues arising out of PSC’s adjustment of RTC’s rates by ordering the payment of a 2% royalty may not be justiciable until at least the year 2002. However, a live controversy remains as to the authority of the PSC to impute a 2% royalty on all regulated utilities. Given PSC’s refusal to entertain further general challenges in individual rate cases, appellants have no other forum in which to challenge the authority of the PSC to impute a 2% royalty and impose the rebuttable presumption. We now turn to the merits of this appeal.
 

 The royalty at issue contains two components, a regulated value assurance mechanism (the RVAM) and a positive benefits element. The RVAM was designed to compensate the ratepayers for the imprudent, uncompensated use of RTC’s intangible assets, such as its name and reputation, while the positive benefits aspect, a misnomer, was designed to address the improper shifting of costs from the unregulated subsidiaries and affiliates to the regulated utility.
 

 Appellants argue that the imposition and quantification of the royalty is unsupported by the record. Appellants contend that the RVAM improperly permits ratepayers to benefit from a non-rate-making asset because the utility does not earn a rate of return on the utility’s name and reputation. Appellants also argue that the record does not contain any finding of imprudence on the part of the utility and that diversification did not impose any costs on ratepayers. Appellants further argue the record contains no basis for the quantification of the 2% royalty.
 

 The Legislature has granted the PSC broad regulatory authority over various public utilities in the highly technical field of setting just and reasonable rates (Public Service Law § 65 [vesting the PSC with authority over gas and electricity utilities]; § 79 [steam]; § 89-b [waterworks]; § 91 [telephone and telegraph];
 
 see also, Matter of Abrams v Public Serv. Commn.,
 
 67 NY2d 205, 211-212;
 
 Niagara Mohawk Power Corp. v Public Serv. Commn.,
 
 69 NY2d 365, 369,
 
 rearg denied
 
 69 NY2d 1038). The PSC’s determinations, within the ambit of its authority,
 
 *29
 
 are entitled to deference and may not be set aside unless they are without rational basis or without reasonable support in the record
 
 (Matter of Abrams v Public Serv. Commn., supra,
 
 at 212).
 

 We have held that the PSC may not deny a utility a reasonable rate of return on its investment in the exercise of its rate-making power
 
 (Niagara Mohawk Power Corp. v Public Serv. Commn., supra,
 
 at 369). The PSC is also charged with the duty of ensuring that a telephone utility charges just and reasonable rates to its customers (Public Service Law § 91). In determining whether a utility has set reasonable rates, we have held that the PSC must evaluate the economic consequences of a utility’s actions so that ratepayers may be protected from the utility’s imprudent acts (see,
 
 Niagara Mohawk Power Corp. v Public Serv. Commn., supra,
 
 at 369;
 
 Matter of Abrams v Public Serv. Commn., supra
 
 [applying the prudent investment test]).
 

 We conclude that the PSC had a rational basis for the RVAM element of the royalty. The record contains support for PSC’s conclusion that RTC’s name and reputation have value. RTC sought to exploit these intangible assets by closely associating itself with its affiliates in various advertising campaigns. It is undisputed that the unregulated subsidiaries and affiliates did not pay for the use of RTC’s logo and name.
 

 Where a utility derives benefit from the use of a non-rate-based asset paid for by the ratepayers, we have held that the PSC may allocate part of the cost borne by the ratepayers to the shareholders. In
 
 Matter of Consolidated Edison Co. v Public Serv. Commn.
 
 (66 NY2d 369,
 
 appeal dismissed
 
 475 US 1114), a utility sought to include nonbilling information with the billing statements sent to its ratepayers. Although the inserts would not impose any additional expense on the fixed costs (paid by the ratepayers) of preparing and mailing the billing statements, we agreed that the PSC may require the shareholders to bear 50% of the costs involved in mailing the billing information. "[Njothing in the Constitution requires that the shareholders get a free ride on the backs of the ratepayers” (66 NY2d, at 372).
 

 Insofar as the ratepayers have borne the costs for creating value in RTC’s name and reputation, the ratepayers are entitled to a prudent use of those assets
 
 (see, Matter of General
 
 
 *30
 

 Tel. Co. v Lundy,
 
 17 NY2d 373, 378).
 
 [2]
 
 The RVAM properly compensates ratepayers for RTC’s imprudence in allowing the free use of its intangible assets rather than impermissibly granting ratepayers a direct interest in those assets
 
 (see, Board of Commrs. v New York Tel. Co.,
 
 271 US 23, 31-32;
 
 see also, Matter of Kessel v Public Serv. Commn.,
 
 193 AD2d 339, 346).
 

 Appellants’ repeated protestations that PSC failed to make an imprudence finding in opinion No. 93-11 are unpersuasive. A fair reading of opinion No. 93-11 indicates that the PSC concluded that RTC acted imprudently by permitting its subsidiaries and affiliates to use valuable intangible assets, i.e., RTC’s name and logo, free of charge. For example, PSC states the following in opinion No. 93-11,
 

 "Turning first to statutory authority, the Public Service Law requires that rates be just and reasonable but says little about what that concept means; we have broad authority to put flesh on the statute’s bones. Most often this is done by attempting to project actual costs and revenues as closely as possible and then setting rates on the basis of those projections, but non-cost items may also be considered, and, indeed, 'there is no requirement in law that any specific factors * * * be considered in fixing utility rates nor that any be excluded from consideration.’ Other available techniques include the use of reasonable, percentage-based rules of thumb for such items as productivity improvements and advertising expenses, and the imputation of revenues that a reasonable and prudent utility could have tried and likely would have been able to earn” (at 36-37).
 

 "A utility in an arms-length transaction could be expected to receive revenues for allowing the use of its employees or goodwill” (at 38).
 

 "A utility should make [a reasonable level of off-system electric] sales and receive such revenues [from directory publishing]; if it chooses not to, the revenue (and return)
 
 *31
 
 shortfall is its own fault. Similarly, a utility should receive reasonable remuneration when its affiliates benefit from it” (at 41).
 

 "Because ratepayers have funded the salaries, training, advertising, and other activities that generate good will, they are entitled to rate recognition of revenues received by the utility in exchange for the use of that asset by an affiliate or otherwise” (at 37).
 

 "[A]ssets should be devoted to serving ratepayers and not dissipated for shareholders’ benefit” (at 66).
 

 The PSC also considered the prudence standard in making its determinations. It observed that various methods for determining just and reasonable rates could be used and that "Traditionally, regulation has proceeded by allowing for recovery of reasonable, prudent costs, plus a fair profit” (at 66).
 

 The Appellate Division upheld PSC’s imprudence finding. Although it would have been preferable for the PSC to explicitly state that RTC acted imprudently, we find no reason to require the incantation of certain "magic” words when PSC’s opinion clearly contains, through the use of other words, a finding of imprudence. Because the record supports that finding, we refuse to disturb the Appellate Division’s affirmance of PSC’s imprudence determination.
 

 PSC’s conclusion that RTC’s imprudence could be imputed to all utilities through the rebuttable presumption is also rational. The circumstances which led to RTC’s imprudence finding are not unique to that utility. In opinion No. 94-2,
 
 [3]
 
 the PSC found that NYNEX and its affiliates relied heavily on the reputation of New York Telephone (a party to this appeal) in establishing itself and that New York Telephone "has certainly conveyed to the joint operation the good will and reputation that were developed with ratepayer funding.” Moreover, PSC noted that full page advertisements appeared in major
 
 *32
 
 newspapers associating NYNEX with New York Telephone and the former Bell system.
 

 In an Order Authorizing Additional Investment by Niagara Mohawk Power Corporation (another party to this appeal), in its subsidiary, HYDRA-CO (case 93-M-0453), the PSC found that HYDRA-CO obtained financing at terms it might not otherwise have obtained because of its affiliation with Niagara Mohawk. Although Niagara Mohawk had not lent the use of its name to HYDRA-CO, PSC found that Niagara Mohawk had helped its subsidiary in a variety of ways. Recognizing the relevance of other factors, PSC ordered Niagara Mohawk to file an affidavit stating whether it would allow its subsidiary to use Niagara Mohawk’s name, financial position, logo, expertise and experience, and over-all reputation.
 

 PSC arrived at the RVAM component after considering the submissions of numerous regulated utilities who, at PSC’s invitation, participated in the hearings before two different Administrative Law Judges. The record of the hearings indicates that ALLtel New York Inc., Central Hudson Gas & Electric Corporation, Continental Tel. of New York, the Empire State Petroleum Assoc. Inc., New York Gas Group, Brooklyn Union Gas Company, Rochester Gas and Electric Corporation, New York State Electric and Gas Corporation, National Fuel Distribution Corporation, and Long Island Lighting Company submitted some or all of the following: initial briefs, reply briefs, posthearing briefs, briefs on exceptions, briefs opposing exceptions, reply briefs on exceptions, memoranda, comments, supplemental comments, supplemental briefs, or their equivalents, during the initial and reopened hearings. Almost none of the regulated utilities disputed that utilities possessed intangible assets arising out of their name and reputation. Instead, most of the utilities argued that ratepayers did not possess an interest in those intangible assets or that the value of those assets could not be quantified. The Empire State Petroleum Inc. agreed with the PSC that the RVAM encompassed "generic factors which are relevant to the relationship between a utility and its unregulated subsidiary, regardless of whether that utility is engaged in the provision of telephone, gas, electric or water service.”
 

 It is reasonable to conclude, as PSC did from this record, that a utility that permits its subsidiaries and affiliates to exploit valuable intangible assets for free, acts imprudently. Moreover, the imputation of the royalty does not result in an automatic obligation to pay the royalty. Utilities will have the
 
 *33
 
 opportunity to demonstrate that the RVAM component does not apply to their individual cases.
 
 [4]
 
 The record indicates that the PSC had a rational basis for adopting the RVAM component of the rebuttable presumption.
 

 The positive benefits component of the royalty is also supported by the record. The record contains evidence of actual costs imposed on ratepayers as a result of RTC’s diversification and evidence of RTC’s abundant incentive to shift costs from its unregulated subsidiaries and affiliates to its monopoly operations. A parent utility has an incentive to support its subsidiaries by not entering into transactions at arm’s length, and pass off any additional expense which may result to the parent’s ratepayers. For example, RTC bought AT&T switching equipment from Rotelcom, a RTC subsidiary, at a mark-up from AT&T prices, when RTC could have bought the equipment directly from AT&T without paying the mark-up.
 

 Regulated utilities also subsidize their subsidiaries and affiliates when the expertise and experience of the utilities’ employees are placed at the disposal of the subsidiaries and affiliates for consultation and advice. Since ratepayers have paid for these human resources through training, salaries, bonuses and other incentive programs, the diversion of employee resources on subsidiary and affiliate matters imposes costs on the ratepayers. The record reflects that RTC did not adequately track and/or compensate its ratepayers for the costs of permitting its subsidiaries and affiliates access to RTC employees.
 

 "When a utility guarantees the bank debt of a subsidiary or affiliate, higher costs will be imposed on the guaranteeing utility’s ratepayers if a bailout of that subsidiary or affiliate becomes necessary. For example, RTC guaranteed loans for RCI, a subsidiary. Consequently, RCI’s lenders have recourse against RTC in the event of a default by RCI. RTC also invested over $40 million in RCI, to prevent the subsidiary from defaulting, when RCI could not meet the financial criteria set forth in a loan agreement.
 

 
 *34
 
 The foregoing is not meant to be an exhaustive listing, but sets forth some of the various cost factors associated with the positive benefits component of the royalty. Given the complexity of the relationships between various utilities and their subsidiaries and affiliates, as well as the volume of transactions that must be scrutinized, PSC’s conclusions that certain costs could not be adequately quantified and that current oversight systems could not capture all cases of improper cost shifting, were rational and supported by the record.
 

 We also reject appellants’ claim that PSC’s exercise of discretion in setting the royalty level at 2% lacked a rational basis. Rate making is a highly technical field within the special expertise of the PSC
 
 (Matter of Abrams v Public Serv. Commn., supra,
 
 at 211-212;
 
 Matter of New York State Council of Retail Merchants v Public Serv. Commn.,
 
 45 NY2d 661, 672). In quantifying the royalty, PSC applied the expertise it had acquired in the context of previous settlements, where the amount of rate adjustments could not be precisely or objectively determined. The record also contained evidence that the PSC had previously imputed a percentage in quantifying objectively unascertainable items such as reasonably anticipated productivity improvements and allowances for certain types of advertising.
 

 The 2% royalty was designed to compensate ratepayers for the uncompensated use of RTC’s intangible assets and the costs of diversification, without imposing a penalty on RTC. PSC’s exercise of judgment in this highly technical field was reasonable, especially given the ability of individual utilities to rebut the 2% figure. As recognized by the Appellate Division, the PSC envisioned situations in which individual utilities would be required to pay a different or no royalty percentage. This built-in flexibility renders the rebuttable presumption rational because any royalty ultimately imposed will be tailored to the individual circumstances of particular utilities.
 

 Appellants raise two constitutional questions. Appellants argue that the royalty presumption constitutes an unconstitutional taking under the Federal and New York State Constitutions, and that the royalty presumption violates the Commerce Clause. We conclude that the takings issue before us is not justiciable because the impact of the rebuttable presumption cannot be evaluated separate and apart from the actual application of the royalty to a particular utility. As already noted, due to the Joint Stipulation, any takings issue arising from the specific application of the royalty to RTC is moot. We do not
 
 *35
 
 foreclose the possibility that a utility directly affected by the application of the rebuttable presumption may raise a takings challenge at some future appropriate date.
 

 Appellants also argue that the royalty violates the Commerce Clause because the royalty imposes a heavy and discriminatory burden on interstate commerce, unjustified by any legitimate local interest. The Supreme Court has articulated the general rule for determining the validity of State statutes affecting interstate commerce:
 

 "Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.”
 
 (Pike v Bruce Church,
 
 397 US 137, 142.)
 

 We may properly decide the Commerce Clause claim because the relevant standard permits evaluation of the widespread, general effects of a State regulation. We need not limit our evaluation of the royalty to the effects generated by specific applications of the rebuttable presumption, but may look to the royalty’s general effects on interstate commerce. Here, the royalty is to be applied evenhandedly, since opinion No. 93-11 contains no exemptions for investment in New York State subsidiaries or affiliates. Moreover, since the royalty is imposed on the utilities, not on out-of-State subsidiaries and affiliates, the financial impact on interstate commerce appears negligible. Since the State has a legitimate interest in setting just and reasonable utility rates, and the royalty is rationally related to that end, PSC’s actions do not impose an impermissible burden on interstate commerce.
 

 Accordingly, the judgment of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Kaye and Judges Simons, Titone, Bellacosa and Ciparick concur; Judge Levine taking no part.
 

 Judgment affirmed, with costs.
 

 [1]
 

 . Other signatories to the Joint Stipulation were Time Warner Communications, the Communications Workers of America, AFL-CIO, the New York State Telephone Association, the New York State Department of Economic Development and the Public Utility Law Project of New York.
 

 [2]
 

 . As noted by the PSC in opinion No. 93-11, RTC ratepayers have funded the salaries, training, advertising and other activities that generate good will. Ratepayers have also paid for capital investments which have contributed positively to RTC’s name and reputation. Moreover, a utility is able to establish widespread name recognition because the monopoly nature of the utility industry provides a widespread, captive ratepayer base in which to instill the name recognition. These ratepayers cannot obtain the same services from a competitor because no competitor exists.
 

 [3]
 

 . The opinion arose out of five consolidated proceedings at the PSC: case 92-C-0665, Proceeding on Motion of the Commission to Investigate Performance-Based Incentive Regulatory Plans for New York Telephone Company; case 92-C-0001, Petition of New York Telephone Company for Permission to Defer Its Share of the Costs Resulting from Two Recent Settlements of Tax Issues Involved in an Internal Revenue Service Audit of American Telephone and Telegraph Company Covering the Years 1981 to 1983, Filed in case 8579; and cases 92-C-0150, 92-C-0228 and 92-C-0342, all Petitions for Approval, Pursuant to Public Service Law, Section 113 (2), of a Proposed Allocation of Certain Tax Refunds between New York Telephone Company and Ratepayers
 

 [4]
 

 . In a Proceeding on Motion of the Commission as to the Rates, Charges, Rules and Regulation of National Fuel Gas Distribution Corporation for Gas Service (case 93-G-0756), the PSC declined to impose a royalty for intangible assets despite the urging of the Consumer Protection Board and the staff of the Department of Public Service to do so. PSC observed that National Fuel had submitted evidence, which had not been challenged, that all of the benefits associated with the National Fuel name, logo, and reputation were as much associated with National Fuel operations outside New York as with the local distribution company.