**MINNEGASCO, A DIVISION OF NORAM ENERGY CORP., f/k/a/ Minnegasco, a Division of Arkla, Inc., Petitioner, Appellant,**

**Northern States Power Co., et al., Petitioners, Appellants,**

**v.**

**MINNESOTA PUBLIC UTILITIES COMMISSION, Respondent,**

**Minnesota Alliance for Fair Competition, Respondent.**

Nos. C5–94–1820, C7–94–1821.

Supreme Court of Minnesota.

June 13, 1996.

Rehearing Denied July 18, 1996.

Margie E. Hendricksen, Asst. Atty. Gen., St. Paul, for Respondent M.P.U.C.

James D. Larson, Wurst, Pearson, Larson, Underwood & Mertz, Minneapolis, for Respondent Minnesota Alliance for Fair Competition.

Scott W. Johnson, Faegre & Benson, Minneapolis, for Amicus Curiae.

Miggie E. Cramblit, Minnegasco, Samuel L. Hanson, Briggs & Morgan, Minneapolis (Paul T. Ruxin, Jones, Day, Reavis & Pouge, Cleveland, OH, of counsel), for Appellant Minnegasco.

Michael J. Bradley, M. Cecilia Ray, Moss & Barnett, Minneapolis, for Appellant N.S.P.

## OPINION

PAGE, Justice.

Minnegasco appeals a decision of the court of appeals affirming the Minnesota Public Utilities Commission's (MPUC) order in *In the Matter of the Complaint of the Minnesota Alliance for Fair Competition Against Minnegasco, a Division of Arkla, Inc.*, No. G–008/C–91–942. At issue in this appeal are those parts of the MPUC's order: (1) authorizing the MPUC to impute revenue to Minnegasco for the value of Minnegasco's good will used by an affiliated business[1] without compensation to Minnegasco; and (2) allocating the costs associated with responding to gas leaks to Minnegasco or its affiliated business, depending on whether the leak occurs in Minnegasco's gas distribution lines or in the customer's gas lines, equipment, or appliances.

The court of appeals held that: (1) the MPUC has the statutory authority to impute revenue to Minnegasco for the value of Minnegasco's good will used by Minnegasco's affiliated business without compensation to Minnegasco, based on its conclusion that the MPUC has the authority to protect ratepayers from subsidizing a utility's affiliated business; and (2) the MPUC has the statutory authority to allocate the costs of responding to gas leaks between Minnegasco and Minnegasco's affiliated business based on its conclusion that Minn.Stat. § 216B.16, subd. 11 (1994), only requires necessary costs to be recognized in the determination of rates. *Minnegasco v. Minn. Pub. Utils. Comm'n*, 529 N.W.2d 413, 418, 420 (Minn.App.1995). We reverse.

Minnegasco is a public utility that distributes natural gas to approximately 615,000 customers in Minnesota. Minnegasco's natural gas operations are regulated by the MPUC pursuant to Minn.Stat. ch. 216B. Minnegasco also operates an affiliated appli-

---

1. Northern States Power Company, Otter Tail Power Company, Northern Minnesota Utilities, and Peoples Natural Gas Company, Divisions of UtiliCorp, were granted participant status in the underlying proceeding by the MPUC and appeal this issue on essentially the same grounds as Minnegasco.

ance sales and service business under the "Minnegasco" name. The affiliated appliance business is not regulated by the MPUC. Minnegasco and its affiliated appliance business share employees, facilities, equipment, and operations. Currently, the costs incurred by Minnegasco in responding to gas leaks are allocated to Minnegasco without regard to where the leak occurred or whether technicians from Minnegasco or the affiliated appliance business respond to the leak.

This case arose out of a complaint filed by the Minnesota Alliance for Fair Competition[2] with the MPUC alleging, among other things, that Minnegasco subsidized its affiliated appliance business: (1) by allowing the affiliated appliance business to benefit from the use of good will associated with the "Minnegasco" name without having to pay for it; and (2) by allocating to Minnegasco all costs incurred in responding to gas leaks without regard to where the gas leak occurred. After a number of proceedings, including a contested case hearing before an Administrative Law Judge, the MPUC found value[3] in Minnegasco's name, image, and reputation, and that, by statute, the MPUC has the authority to impute revenue to Minnegasco for the value of good will used, but not paid for, by an affiliated appliance business. The MPUC found that its authority to determine that a gas utility's name and reputation have value and to impute revenue to the gas utility arises from its duty to set just and reasonable rates under Minn.Stat. §§ 216B.03 and 216B.08, its supervisory authority over affiliated interests under Minn.Stat. § 216B.48, and in its inherent ratemaking authority as recognized in In re Application of N.W. Bell Tel. Co., 367 N.W.2d 655 (Minn.App.1985). The MPUC also found that the costs associated with responding to gas leaks should be allocated to Minnegasco's affiliated appliance business when the leak occurs in the customer's internal gas lines, equipment, or appliances, and to the gas utility when the leak occurs in the gas utility's distribution lines.

This case presents three issues for our review: (1) whether the MPUC has the stat-

utory authority to impute revenue to a gas utility for the value of good will used, but not paid for, by the gas utility's affiliated business; (2) whether imputing revenue to a gas utility for the value of good will used, but not paid for, by the gas utility's affiliated business, amounts to an unconstitutional taking; and finally (3) whether the MPUC has the statutory authority to require Minnegasco to allocate the costs associated with responding to gas leaks to both Minnegasco and its affiliated appliance business, depending on where the gas leak occurs.

 The determination of whether the MPUC has the statutory authority to act and whether, in so acting, it engages in an unconstitutional taking, raises questions of law which are subject to *de novo* review. *See State ex rel. McClure v. Sports & Health Club,* 370 N.W.2d 844, 854 n. 17 (Minn.1985) *appeal dismissed, Sports & Health Club Inc. v. Minnesota,* 478 U.S. 1015, 106 S.Ct. 3315, 92 L.Ed.2d 730 (1986); *No Power Line, Inc. v. Minnesota Envt'l Quality Council,* 262 N.W.2d 312, 320 (Minn 1977); *see also* Minn. Stat. § 14.69 (1994) (setting forth grounds for judicial reversal or modification of agency decision). The MPUC, as a creature of statute, only has the authority given it by the legislature.

The legislature states what the agency is to do and how it is to do it. While express statutory authority need not be given a cramped reading, any enlargement of express powers by implication must be fairly drawn and fairly evident from the agency objectives and powers expressly given by the legislature.

*Peoples Natural Gas Co. v. Minnesota Pub. Util. Comm'n,* 369 N.W.2d 530, 534 (Minn. 1985).

 We first address the question of whether the MPUC has the statutory authority to impute revenue to Minnegasco for the value of Minnegasco's good will passed, without compensation, from Minnegasco to its affiliated appliance business. The MPUC ar-

---

**2.** The Minnesota Alliance for Fair Competition is a trade association of plumbing, electrical, and appliance businesses which compete with Minnegasco's affiliated appliance business.

**3.** The actual valuation of Minnegasco's good will was deferred to a separate rate proceeding.

gues that its authority to impute revenue for the affiliate's use of Minnegasco's good will comes from its authority to set just and reasonable rates under Minn.Stat. §§ 216B.03 and 216B.08, its supervisory authority over affiliated interests under Minn. Stat. § 216B.48, and its inherent ratemaking authority. In support of this argument, the MPUC relies on decisions from Florida, New York, and Oklahoma, each of which held that the respective utility commission had the authority to impute revenue to the utility for an affiliate's use of the utility's good will.[4] In response, Minnegasco raises a number of arguments. While conceding that the MPUC has the statutory authority to impute revenue where it is necessary to avoid a subsidy to the affiliated business, Minnegasco contends that, in this case, the MPUC lacks the statutory authority to impute revenue because, under Minn.Stat. § 216B.16, subd. 6, it is the cost of furnishing the utility service that is to be considered in establishing just and reasonable rates, and that the value of good will is not a cost of furnishing the utility service; good will is an asset of the gas utility that belongs to the gas utility's shareholders and not the ratepayers; and finally there is no subsidization of Minnegasco's affiliated appliance business by a transfer of Minnegasco's good will to the affiliate because ratepayers have not borne the cost of creating the good will.

The MPUC's authority to set rates is found in Minn.Stat. ch. 216B. Chapter 216B does not provide the MPUC with express statutory authority to impute revenue to a gas utility for the value of good will passed, without compensation, from a utility to an affiliated business. Therefore, the MPUC lacks authority to impute revenue under these circumstances unless the implied authority can be "fairly drawn" and is "fairly evident" from the "objectives and powers expressly given by the legislature." *Peoples Natural Gas Company*, 369 N.W.2d at 534.

■ As it relates to the issues presented here, the MPUC's objective is to set just and reasonable rates and to protect the ratepayers from subsidizing Minnegasco's affiliated appliance business. Minn.Stat. §§ 216B.03 and 216B.48, subd. 5 (1994). In setting just and reasonable rates, the MPUC must give "due consideration to the public need for adequate, efficient, and reasonable service and to the need of the public utility for revenue sufficient to enable it to meet the *cost* of furnishing the service * * *." *Id.* § 216B.16, subd. 6 (emphasis added). In *Northern States Power v. Minnesota Pub. Util. Comm'n*, 344 N.W.2d 374 (Minn.), *cert. denied*, 467 U.S. 1256, 104 S.Ct. 3546, 82 L.Ed.2d 850 (1984), we said:

> Minn.Stat. § 216B.03 (1982) provides that the MPUC shall establish "just and reasonable" retail rates. In order to establish "just and reasonable" retail rates, the MPUC must consider the right of the utility and its investors to a reasonable return, while at the same time establishing a rate for consumers which reflects the cost of service rendered plus a "reasonable" profit for the utility. *Narragansett Electric Co. v. Burke*, 119 R.I. 559, 381 A.2d 1358 (1977), *cert. denied*, 435 U.S. 972, 98 S.Ct. 1614, 56 L.Ed.2d 63 (1978). To accomplish this purpose, the MPUC must ascertain

---

4. In our view, these decisions do not provide any assistance in resolving the issues before us in this case because of the differences in the statutes being interpreted and/or the context in which the cases arose. The Florida case, *United Telephone Long Distance v. Nichols*, 546 So.2d 717 (Fla. 1989), involved the Florida Public Service Commission's authority to issue certificates of convenience and necessity and did not involve the Commission's authority, when setting rates, to impute revenue for the value of good will used by the utilities' affiliates. In fact, Fla.Stat. ch. 366.06(1) (1993) specifically excludes the value of good will from utility rates. In *Rochester Telephone Corp. v. Public Service Commission*, 87 N.Y.2d 17, 637 N.Y.S.2d 333, 660 N.E.2d 1112 (1995), the New York Court of Appeals addressed the New York Commission's longstanding broad authority to regulate utilities' imprudent acts. Our legislature, however, has not granted the MPUC authority over utilities' imprudent acts except in limited circumstances. *See* Minn.Stat. § 216B.16, subds. 6 (MPUC required to give due consideration to prudent acquisition costs), 9 (MPUC shall allow only prudent charitable contributions). Finally, the Oklahoma decision, *Re Southwestern Bell Tel. Co.*, 137 Pub.Util.Rep. 4th (PUR) 63 (Okla.Corp.Comm'n 1992), is an Oklahoma Corporation Commission decision and not a decision by an Oklahoma Court. We are not inclined to follow a decision of another jurisdiction's utilities commission to determine our own Commission's authority.

the operating expenses, or cost of service, of the utility.

*Northern States Power,* 344 N.W.2d at 378.

The cost of furnishing utility service typically includes: "labor, materials and supplies, taxes, insurance, and depreciation." Samuel L. Hanson & R. Scott Davies, *Judicial Review of Rate of Return Calculations,* 8 Wm.Mitchell L.Rev. 499, 501 (1982). Under Minn.Stat. § 216B.16, subd. 6, depreciation of the gas utility's property used and useful in rendering utility service to the public is also considered a cost of furnishing service. In addition, the cost of furnishing service may include the financing cost of money invested in the gas utility's plant and equipment. *See* Minn.Stat. § 216B.16, subd. 6; Hanson & Davies, *supra,* at 501.

■ Though good will may be a by-product of the service rendered, it is clear from the record that Minnegasco's good will is not an asset used and useful in rendering service to the public. It is also clear that the value of a gas utility's name and reputation, as represented by good will, is generally not considered to be a "cost" of rendering utility service and that the costs associated with creating the good will have not been borne by the ratepayers. Certainly, ratepayers are involved in building a gas utility's good will when they purchase utility service. However, ratepayers are no different in that regard than any consumer who purchases a product from a business. The simple act of purchasing a product or service from a business does not mean that the consumer becomes an owner of any of the business' assets.[5] Nor does it mean that the consumer bears the cost of creating good will. The relationship between the ratepayer, as a consumer, and the gas utility, as a business, does not change just because the gas utility provides regulated utility services. The ratepayer remains a consumer and the assets remain the property of the utility.

■ Thus, we conclude that the value of Minnegasco's good will is not a "cost" of furnishing utility service. Because good will is not a "cost" of furnishing utility service, it cannot be said that the authority for the MPUC to impute revenue for the value of Minnegasco's good will that is used, but not paid for, by an affiliated appliance business is "fairly drawn" or "fairly evident" from the powers expressly given by the legislature. Further, because the ratepayers have not borne the cost of creating the good will, we conclude that there is no ratepayer subsidization of Minnegasco's affiliated appliance business resulting from the affiliate's unpaid for use of Minnegasco's good will. Therefore, we reverse the court of appeals and hold that in this case the MPUC lacks the statutory authority to impute revenue to Minnegasco for the value of Minnegasco's good will used, but not paid for, by Minnegasco's affiliated appliance business.[6]

We believe it is necessary to comment, at least briefly, on the dissent. The dissent asserts that the issue of whether the MPUC has the statutory authority to impute revenue for the value of good will used, but not paid for, by an affiliated business "is one of fairness." That assertion is wrong. The only issue before us is one of statutory construction: whether chapter 216B, as enacted by the legislature, permits the MPUC to impute such revenue. To the extent that this case presents a fairness question, it is a policy question to be answered by the legislature and not the seven members of this court.[7] *State Dept. of Highways v. McWhite,*

5. This is consistent with Justice Marshall's observation in his concurring opinion in *Pacific Gas & Electric Company v. Public Utilities Commission of California,* 475 U.S. 1, 22 n. 1, 106 S.Ct. 903, 915 n. 1, 89 L.Ed.2d 1 (1986). Justice Marshall said:

[A] consumer who purchases food in a grocery store is paying for the store's rent, heat, electricity, wages, etc., but no one would seriously argue that the consumer thereby acquires a property interest in the store. That the utility passes its overhead to ratepayers at a rate fixed by law rather than the market cannot affect the utility's ownership of its property * * *.
*Id.* (Marshall, J., concurring).

6. Because of our resolution of this issue, we need not, and therefore do not, address Minnegasco's constitutional arguments.

7. The dissent suggests that Minn.Stat. § 216B.48, subd. 6, supports the conclusion that the MPUC has the authority to impute revenue from Minnegasco's affiliated appliance business to Minnegasco for the use of good will. Because the

286 Minn. 468, 472, 176 N.W.2d 285, 288 (1970) (the court can only interpret statute as written). As it is, the legislature has spoken.

■ Next, we address the question of the MPUC's statutory authority to allocate the costs associated with responding to gas leaks between Minnegasco and its affiliated appliance business. Minnegasco's primary argument is that both federal and Minnesota law require a gas utility to respond to all notices of possible gas leaks and that under Minn. Stat. § 216B.16, subd. 11, it is entitled to recover all costs of responding to those leaks in the rates it charges to customers. We agree.

By statute, Minnegasco is required to respond to each notice of a gas leak it receives as part of the state's pipeline safety program. Minn.Stat. §§ 299F.57 and 299F.59 (1994). Federal standards require that Minnegasco provide a prompt and effective response to every notice it receives of gas "detected inside or near a building," 49 C.F.R. § 192.615(a)(3)(i) (1995), and to make "safe any actual or potential hazard to life or property." *Id.* § 192.615(a)(7). A gas leak, whether it is detected in Minnegasco's gas distribution line or in a customer's line, equipment, or appliance, is "a potential hazard to life or property." Thus, Minnegasco, as a gas utility required to participate in the state's pipeline safety program, is required under the program to respond to every notice of a gas leak it receives.

■ Minnesota Statute Section 216B.16, subdivision 11, provides:

> All costs of a public utility that are necessary to comply with state pipeline safety programs * * * must be recognized and included by the commission in the determination of just and reasonable rates as if the costs were directly incurred by the utility in furnishing utility service.

The language of section 216B.16, subd. 11, is clear and unambiguous and, therefore, not subject to judicial interpretation. *State v. Carpenter*, 459 N.W.2d 121, 126 (Minn.1990). The language places limits on the MPUC's

ability to allocate the costs associated with responding to gas leaks. The statute mandates that all costs necessary to comply with state pipeline safety programs are to be treated as if they were "directly incurred by the utility in furnishing utility service." Minn.Stat. § 216B.16, subd. 11. There is nothing in the record to suggest that the costs incurred by Minnegasco in responding to gas leaks in customers' lines, equipment, or appliances are any different or any less necessary than the costs associated with responding to leaks in Minnegasco's gas distribution lines. The costs associated with responding to both situations are costs necessary to comply with state pipeline safety programs.

■ As we said above, we will not enlarge the powers of the MPUC beyond those expressly granted by the legislature. *Peoples Natural Gas Co.*, 369 N.W.2d at 534. The MPUC argues that it is permitted to allocate the costs associated with responding to gas leaks because this case involves a gas utility that has established an affiliated appliance business which responds to gas leaks. The MPUC's argument fails because, under the state's pipeline safety program, the responsibility for responding to gas leaks remains Minnegasco's and not the affiliated appliance business'. Therefore, under the plain meaning of the statute, *all* costs necessarily incurred when responding to gas leaks, whether the response is by Minnegasco or the affiliated appliance business, are to be included in the rate as if incurred directly by the gas utility in furnishing utility service. Minn.Stat. § 216B.16, subd. 11.

Therefore, we reverse the court of appeals and hold that the MPUC acted in excess of its statutory authority when it allocated the costs of responding to gas leaks occurring in the customer's lines, equipment, and appliances to the gas utility's affiliated appliance business and excluded those costs from Minnegasco's rates.

Reversed.

issues before us relate to the MPUC's ratemaking authority, today's decision should not be read as expressing a view as to the MPUC's authority to regulate contractual agreements between affiliates and regulated utilities under Minn.Stat. § 216B.48.

GARDEBRING, J., concurs and dissents in part.

TOMLJANOVICH and STRINGER, JJ., took no part in the consideration or decision of this case.

GARDEBRING, Justice (concurring in part, dissenting in part).

This case is, of course, part of a larger utility ratemaking process. That such cases have become highly technical and voluminous in record is axiomatic to those who practice in this field. This case is no exception: the administrative record in this case spans over 1000 pages of transcript and includes boxes of supporting documents. It is replete with detailed analyses by accountants and economists, with cost allocation methods and with discussions of "flotation cost adjustment." In the midst of this technical evidence and the complex legal doctrines that govern decisions in utility ratemaking, it is easy to lose sight of first principles. Here the issue is one of fairness.

The obligation of the Minnesota Public Utilities Commission (MPUC) is to set "just and reasonable rates." Minn.Stat. § 216B.03 (1994). Is it *just* and *reasonable* for the private owners of a nonregulated business to benefit from the goodwill generated by the activities of a monopoly, without compensating the monopoly for that benefit? Put more simply, is it *just* and *reasonable* for the utility to give away a valuable asset? I think not and so I respectfully dissent from the portion of the majority opinion holding that the MPUC is without authority to impute revenues from that nonregulated business to Minnegasco.

Goodwill is "[t]he capacity to earn profits in excess of a normal rate of return due to establishment of favorable community reputation and consumer identification of the business name." Black's Law Dictionary (6th ed. 1990) at 695. Minnegasco has not denied that the goodwill associated with the company name and reputation has value in an unregulated environment. Indeed it would be hard pressed to do so in light of its own market study which demonstrated that appliance services advertised under the Minnegasco name were three times as appealing to consumers as identical services offered under the name "True Blue."

Further, Minnegasco even concedes that the MPUC has authority to impute revenue from the nonregulated business to Minnegasco if a subsidy flows from the utility to a nonregulated business. However, it goes on to argue that the Federal Communications Commission (FCC) cost allocation system, required by the MPUC in this proceeding, is so pervasive in its methodology that there can be no such subsidization not already captured. But, as the state notes, the flaw in this argument is to assume that the only type of subsidy that can exist is an improper allocation of costs, where certain individuals and activities serve both the utility and the nonregulated business. This definition misses the mark where the subsidy is something more direct: the transfer of a valuable, intangible asset of the utility to the nonregulated business without charge. Furthermore, the FCC itself, in its description of the methodology adopted by the MPUC, notes that the approach does not extend to cover "the allocation of intangible benefits * * * which may occur due to [utility] diversification." Federal Communications Comm'n, *In the Matter of Separation of Costs of Regulated Telephone Service from Costs of Nonregulated Activities,* Report and Order No. 86–564 in Docket No. 86–111 (Released Feb. 6, 1987). As noted by the MPUC, Minnegasco is foregoing a revenue opportunity by allowing the use of the utility's name, image and reputation without charge. That can only be considered a subsidy.

The majority adopts a curious perspective on the question of how this valuable asset was created when it concludes that "the costs associated with creating good will have not been borne by the ratepayers." If not the ratepayers, who? The things that contribute to good will—particularly efficiency and safety of service—are certainly the product of items specifically included in the rate base and thus paid for by consumers.

By this argument, the majority seems to adopt the position of Minnegasco that through the imputation of income from the nonregulated industry to the utility, the MPUC is attempting to create an equitable

interest for the ratepayers in the utility's assets. This, asserts the utility, is contrary to the strictures of the Supreme Court in *Board of Public Utility Commissioners v. New York Telephone Company*, 271 U.S. 23, 46 S.Ct. 363, 70 L.Ed. 808 (1926), which held that ratepayers acquire no such legal or equitable interest by paying bills for utility service. The majority would apparently agree with the utility that by reducing the rates through imputation of revenue, the MPUC is giving an interest in the utility that belongs to the shareholders. It cites Justice Marshall's analogy in *Pacific Gas & Electric Co. v. Pub. Utils. Comm'n of California*, 475 U.S. 1, 22 n. 1, 106 S.Ct. 903, 915 n. 1, 89 L.Ed.2d 1 (1986) (Marshall, J., concurring), that a grocery shopper indirectly pays for the cost of running the store, but does not gain a property interest in it simply by shopping there.

This argument, however, begs the question. The grocery shopper is not a captive ratepayer and the supermarket is not a monopoly, regulated by a government entity which has the responsibility of assuring that ratepayers pay only for the cost of service (plus a reasonable rate of return on the shareholders's investment, of course). *See Northern States Power Co. v. Minnesota Public Utilities Commission*, 344 N.W.2d 374 (Minn.), *cert. denied*, 467 U.S. 1256, 104 S.Ct. 3546, 82 L.Ed.2d 850 (1984).

Furthermore, even without judicial action to create an equitable interest for ratepayers in the assets of the utility, it is still clear that:

> Because ratepayers have funded the salaries, training, * * * and other activities that generate good will, they are entitled to rate recognition of revenues received by the utility in exchange for the use of that · asset by an affiliate * * *.

*In the Matter of Rochester Telephone Corp. v. Pub. Serv. Comm'n State of New York*, 87 N.Y.2d 17, 31, 637 N.Y.S.2d 333, 339, 660 N.E.2d 1112, 1118 (1995) (quoting the New York Public Service Commission, op. no. 93–11 (July 1993)).

New York is not the only state that has recognized the fundamental fairness of the imputation of income to reflect the transfer of a valuable asset from the utility to the unregulated industry. In Oklahoma, the Public Utility Commission imputed a 5% royalty fee on intangible assets, such as goodwill of the utility, used by its nonregulated affiliates to generate revenue without compensating the regulated utility. The Commission identified what it considered to be "valuable intangible assets" as, among other things, "use of [the utility] trademarks and logos; use of [the utility] name, reputation and public image." *Re Southwestern Bell Telephone Co.*, 137 Pub.Util.Rep. 4th (PUR) 63, 150 (Okla.Corp.Comm'n 1992). It further determined "[the public utility]'s status as the longstanding franchised provider of monopoly * * * service has created nearly universal market awareness and penetration of the [public utility] name, official marks and business reputation * * * maintained at ratepayer costs." *Id.* Both the Commission and the ALJ determined that the benefits reaped by the affiliates from the intangible assets of the regulated utility should be shared with the ratepayers who paid for the expense of generating that public goodwill. *Id.* at 150, 152. This case is much like the one we address here today. Minnegasco's name, reputation and public image have helped to deliver tangible economic revenue to its affiliate through the use of those intangible assets and ratepayers should be compensated for that transfer by a reduction in rates.

Similarly, the Florida Supreme Court found that the Public Service Commission's decision to compensate public utility ratepayers for the transfer of intangible benefits was within the Commission's statutory authority and in the public interest. *United Telephone Long Distance v. Nichols*, 546 So.2d 717, 720 (Fla.1989). Under Fla.Stat. § 366.04, the Florida public service commission has broad powers to "regulate and supervise each public utility." In *Nichols* the public service commission imputed a 2.8% compensation fee to the affiliates of the telephone company. 546 So.2d at 719. The court found that the affiliates' use of the name, logo and reputation of the regulated telephone company required compensation to the ratepayers, and the commission's imputation of such compen-

sation was well within its broad jurisdiction and powers. *Id.* at 719–20.

The majority makes much of its statutory argument, that there is no "express statutory authority to impute revenue to a gas utility for the value of good will passed, without compensation, from a utility to an affiliated business." Indeed! Utility law practitioners would be surprised to find such an intricate and detailed grant of authority in the midst of a statute which grants to the MPUC broad and general powers for ratemaking and gives the benefit of the doubt to the ratepayer. Minn.Stat. §§ 216B.08, 216B.03.

I begin with Minn.Stat. § 216B.08 which grants the MPUC "the powers, rights functions, and jurisdiction to regulate * * * every public utility as defined herein." Further the statute provides that, "The exercise of such powers, rights, functions, and jurisdiction is prescribed as a duty of the commission." This statute mirrors that found in Florida where the state court determined that such a statute clearly granted the commission powers to impute compensation to ratepayers when necessary.

I also note Minn.Stat. § 216B.03 granting to the MPUC the power to set just and reasonable rates and stating specifically "[a]ny doubt as to reasonableness should be resolved in favor of the consumer." This statutory obligation requires the MPUC to compensate the ratepayer where reasonableness is at issue.

Finally, I note Minn.Stat. § 216B.48, subd. 6, which grants the MPUC powers to supervise the contractual terms and conditions between the regulated business and its affiliates "so far as necessary to protect and promote the public interest." This statutory obligation of the commission requires it to be vigilant in assessing the impact of the utility—affiliate relationship on the costs borne by utility ratepayers.

Taken together, these statutory obligations give the MPUC a grant of broad authority. Particularly noting the legislative preference for the ratepayers' interests expressed in Minn.Stat. § 216B.03, I conclude that the implied authority to impute revenue for the transfer of goodwill to a nonregulated affiliate can be "fairly drawn" and is "fairly evi-

dent" from the "objective and powers expressly given by the legislature." *Peoples Natural Gas Company v. Minn. Pub. Util. Comm'n,* 369 N.W.2d 530, 534 (Minn.1985).

Furthermore, it is a fundamental principle of utility law that "if the public interest outweighs the inconvenience and expense to the corporation, the order will generally be upheld." *Otter Tail Power Co. v. Federal Power Commission,* 429 F.2d 232, 236 (8th Cir. 1970), *cert. denied,* 401 U.S. 947, 91 S.Ct. 923, 28 L.Ed.2d 230 (1971). Here there is a powerful public interest in just and reasonable rates that accurately reflect the relationship between the utility and its nonregulated affiliate and that interest is vindicated by the approach of the MPUC on this issue.

Utility ratemaking is a complex business, given the need to meet competing public policy objectives. It involves:

[a] balancing of the investor and the consumer interests * * *. The investor's interest lies in the integrity of his investment and a fair opportunity for a reasonable return thereon. The consumer's interest lies in governmental protection against unreasonable charges for the monopolistic services to which he subscribes.

*Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n,* 485 F.2d 786, 807 (D.C.Cir.1973), (footnotes and citations omitted), *cert. denied,* 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974). In its decision to impute to the utility revenue associated with the transfer of a valuable asset, the MPUC created such a balance. While utility shareholders are legally entitled to a fair return on their investment, simple diversification by the utility should not allow the affiliate to use, without compensation, the "sound-bite" name recognition created by years of establishing community reputation. The MPUC has not given the ratepayers a property interest in the utility assets, it has only done the job it was assigned by the Legislature—to protect the ratepayer.

For the reasons stated above, I therefore dissent.