Matter of National Fuel Gas Distrib. Corp. v Public Serv. Commn. of The State of N.Y. (2019 NY Slip Op 01481)





Matter of National Fuel Gas Distrib. Corp. v Public Serv. Commn. of The State of N.Y.


2019 NY Slip Op 01481


Decided on February 28, 2019


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: February 28, 2019

527095

[*1]In the Matter of NATIONAL FUEL GAS DISTRIBUTION CORPORATION, Petitioner,
v
PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, Respondent.

Calendar Date: January 16, 2019

Before: Garry, P.J., Clark, Mulvey, Aarons and Rumsey, JJ.


Cullen and Dykman, LLP, Albany (Bruce V. Miller of counsel), for petitioner.
John Sipos, Public Service Commission, Albany (John C. Graham of counsel), for respondent.



MEMORANDUM AND JUDGMENT
Mulvey, J.
Proceeding pursuant to CPLR article 78 (transferred to this Court by order of the Supreme Court, entered in Albany County) to review a determination of respondent establishing petitioner's rates for gas service.
Petitioner, a corporation duly incorporated under the laws of New York, provides gas distribution services in New York and Pennsylvania. In April 2016, petitioner filed proposed tariff amendments that would have increased its natural gas delivery rates and charges by approximately $41,700,000 annually or 7.89% of its total net aggregate revenues. This constitutes a "major change" in rates for which an evidentiary hearing is required by law (Public Service Law § 66 [12]). Following the evidentiary hearing, an Administrative Law Judge issued a recommended decision, to which petitioner and the Department of Public Service (hereinafter the Department) filed exceptions. In April 2017, respondent issued an order granting petitioner a rate increase of $5,900,000 to its gas delivery rates and charges for the period from April 1, 2017 to March 30, 2018. Petitioner thereafter commenced this proceeding pursuant to CPLR article 78 seeking, among other things, annulment of the order. Finding that the petition raised the issue of substantial evidence, Supreme Court transferred the proceeding to this Court (see CPLR 7804 [g]).
When an agency renders a determination following a hearing held pursuant to law, this Court will not disturb the determination as long as it is supported by substantial evidence (see CPLR 7803 [4]; Matter of Campaniello v New York State Div. of Tax Appeals Trib., 161 AD3d 1320, 1322 [2018], lv denied 32 NY3d 913 [2019]; Matter of King v New York State Off. of Alcoholism & Substance Abuse Servs., 149 AD3d 1385, 1386 [2017]). Substantial evidence "is a minimal standard" that requires "less than proof by a preponderance of the evidence" (Matter of [*2]FMC Corp. [Peroxygen Chems. Div.] v Unmack, 92 NY2d 179, 188 [1998] [internal quotation marks and citation omitted]; see Matter of Kelly v DiNapoli, 30 NY3d 674, 684 [2018]), and "demands only that a given inference is reasonable and plausible, not necessarily the most probable" (Matter of Ridge Rd. Fire Dist. v Schiano, 16 NY3d 494, 499 [2011] [internal quotation marks and citations omitted]; see Matter of Marine Holdings, LLC v New York City Commn. on Human Rights, 31 NY3d 1045, 1047 [2018]). Although there may be "'substantial evidence on both sides' of an issue disputed before an administrative agency" (Matter of Marine Holdings, LLC v New York City Commn. on Human Rights, 31 NY3d at 1047, quoting Matter of Ridge Rd. Fire Dist. v Schiano, 16 NY3d at 500), under the substantial evidence standard, reviewing courts do not weigh the conflicting evidence or decide if they find the evidence convincing; "[i]nstead, when a rational basis for the conclusion adopted by the agency is found, the judicial function is exhausted" (Matter of Marine Holdings, LLC v New York City Commn. on Human Rights, 31 NY3d at 1047 [internal quotation marks, brackets and citation omitted]). As relevant here, respondent's " determinations in setting just and reasonable rates are entitled to deference and may not be set aside unless they are without rational basis or without reasonable support in the record" (Matter of Home Depot U.S.A., Inc. v State of N.Y. Pub. Serv. Commn., 92 AD3d 1012, 1014 [2012] [internal quotation marks, brackets and citations omitted], lv denied 19 NY3d 811 [2012]; see Matter of Rochester Tel. Corp. v Public Serv. Commn. of State of N.Y., 87 NY2d 17, 28-29 [1995]), because "setting utility rates presents problems of a highly technical nature, the solutions to which in general have been left by the Legislature to the expertise of [respondent]" (Matter of New York Tel. Co. v Public Serv. Commn. of State of N.Y., 95 NY2d 40, 48 [2000] [internal quotation marks, brackets and citations omitted]).
First, respondent's decision to employ the NY-Only method to calculate petitioner's earnings base/capitalization adjustment (also known as EB/Cap) is supported by substantial record evidence. In previous proceedings over the course of decades, petitioner had unsuccessfully urged respondent to adopt this method. Under the NY-Only method, items with capital elements used solely in New York are included entirely and an allocation factor reflecting the percentage of petitioner's base earnings in New York compared to total base earnings is applied to items for which it is impossible to track the flow of money to a specific jurisdiction (New York or Pennsylvania). Respondent had previously accepted the recommendations of Department staff (hereinafter staff) to apply the allocation factor to all of petitioner's items, regardless of whether they could be linked entirely to New York capital. In one of those prior proceedings, petitioner had contended that the NY-Only method would provide a more accurate allocation of capitalization to petitioner's New York division. Indeed, petitioner's current argument is not so much that respondent's decision to employ the NY-Only method (of which petitioner previously approved) is unsupported by substantial evidence, but that respondent committed an error of law in applying a method that it had adamantly opposed in earlier proceedings. The Department now contends that applying an allocation factor to items with NY-Only capital elements reflects an inaccurate level of capitalization for both New York and Pennsylvania. Stating that both methods are fair and recognizing that the Department departed from its prior position, respondent did not err in adopting the NY-Only method, which respondent determined is at least potentially more accurate.[FN1]
Substantial evidence supports respondent's decision to accept the Department's depreciation adjustments. Petitioner argues that respondent's decision to use statistical survivor curves to set the average service life for its structures and improvements account — which was to petitioner's disadvantage — but then use a different approach as to its plastic mains account — when using the survivor curves would have been to its benefit — is not supported by substantial evidence. Petitioner presented proof that average service life calculations should include information and judgment from visual inspections rather than relying solely on statistical data. [*3]Respondent was not convinced that the evidence from visual inspections was so contradictory to the survivor curves as to require deviation from its customary reliance thereon. Thus, respondent accepted the Department's depreciation adjustments to rely on the survivor curves for the structures and improvements account.
Plastic piping is relatively new and most of it has not reached its service life, so survivor curves may not be based on accurate historical data. The record indicates that older vintage plastic piping, as opposed to more recent higher-density plastics, may become brittle and need to be replaced sooner, which may skew data on the curve. Staff members testified that the cast iron and steel piping accounts currently have 73-year average service lives and opined that plastic piping should have the same or higher average service life than these accounts because plastic piping is not susceptible to the chemical reactions that cause corrosion, thereby preventing corrosion leaks. Furthermore, gas leak failures in newer plastic piping are much less frequent because this piping is not brittle. Staff members also reported that two gas utility companies in New York use an 80-year average service life and a 75-year average service life for their plastic mains accounts. Thus, despite evidence supporting a shorter average service life, the record contains substantial evidence supporting the 80-year average service life that respondent accepted for petitioner's plastic mains account.
Substantial evidence supports respondent's denial of petitioner's request to recover incentive compensation for its executive employees. A staff member testified that to recover the costs of variable compensation, petitioner had to demonstrate — with a compensation study of similarly situated companies being the preferred methodology — that its total compensation, inclusive of incentive pay, is reasonable relative to its peers. Alternatively, petitioner could demonstrate that its program "provides quantifiable or demonstrable benefits to its ratepayers in a financial sense or in terms of reliability, environmental impact, or customer service." Petitioner provided a benchmarking study to support the reasonableness of its executive incentive compensation package and, as a result of the study, petitioner concluded that its target total remuneration — which is the sum of base pay, lump-sum pay, long-term incentive pay and total benefits for executive employees — is at the median of the general industry comparator group. The Department complained that it could not verify the reasonableness of petitioner's market competitiveness without additional information regarding the composition of the peer group and details regarding those companies' actual versus targeted incentive payments. When asked to supply that data, petitioner did not. Based on petitioner's failure to provide underlying data to enable evaluation of the results of the benchmarking study, it was reasonable for respondent to conclude that petitioner did not carry its burden in demonstrating that its overall compensation is reasonable (see Matter of Ridge Rd. Fire Dist. v Schiano, 16 NY3d at 499; Matter of Home Depot U.S.A., Inc. v State of N.Y. Pub. Serv. Commn., 92 AD3d at 1014). Furthermore, substantial evidence, including the benchmarking study report, supports a conclusion that petitioner failed to clearly demonstrate that the incentive plan benefits ratepayers rather than shareholders. As respondent reasonably concluded that petitioner failed to carry its burden under either test, substantial evidence supports its denial of petitioner's proposal to recover executive incentive compensation (see Matter of Ridge Rd. Fire Dist. v Schiano, 16 NY3d at 499; Matter of National Fuel Gas Distrib. Corp. v Public Serv. Commn. of the State of N.Y., 16 NY3d 360, 371-372 [2011]; Matter of Home Depot U.S.A., Inc. v State of N.Y. Pub. Serv. Commn., 92 AD3d at 1014).
Respondent's determination that petitioner's normalization adjustment is a belated attempt to obtain approval of a prior major accounting change is supported by substantial evidence in the record. Petitioner sought an adjustment to its uncollectible account expense based on changes necessitated by its updated computer system. If a customer opens a new account but had prior unpaid bills that had been written off, petitioner's new computer system simply attaches the old bills to the customer's new account but labels them as doubtful recoveries. With the old computer system, petitioner had to revive written-off bills to attach them to a customer's new account. Petitioner contends that the change in computer systems requires a "bookkeeping change" to reconcile the write-off of bad debts between its old and new billing systems, resulting in an adjustment of over $1.8 million. Respondent concluded that, [*4]pursuant to regulations, this was a major accounting change requiring prior approval, which petitioner did not seek or obtain.
"So long as the determination is not irrational or unreasonable, judicial deference is particularly appropriate
. . . where the matter involves the agency's interpretation of a regulation that it promulgated and is responsible for administering" (Matter of Glenwyck Dev., LLC v New York Pub. Serv. Commn., 167 AD3d 1375, 1376 [2018] [citations omitted]; see Matter of Council of City of N.Y. v Public Serv. Commn. of State of N.Y., 99 NY2d 64, 74 [2002]). As relevant here, the Department's regulations provide that changes in accounting that have a "material effect" on utility prices (16 NYCRR 48.1 [a]) "may be proposed in conjunction with a general rate filing" or on 60 days' notice to the Department (16 NYCRR 48.2). "A change in accounting is material if the after-tax effect of such change exceeds 0.05 percent of common equity" (16 NYCRR 48.1 [b]).
Although petitioner characterizes this issue as a "bookkeeping change" to reconcile the write-off of bad debts between its old and new billing systems, petitioner's assistant general manager in its collections department conceded that this involved a change in petitioner's process of accounting for prior bad debt balances. As 16 NYCRR part 48 does not define "change in accounting" and it is not clear from the text of the regulations what that term encompasses, we should defer to respondent's reasonable interpretation that petitioner's actions constitute a change in accounting within the meaning of 16 NYCRR 48.1. Respondent also concluded in its order that petitioner's accounting change constituted a material change. Although the regulations do not explain how to calculate whether the after-tax effect of a change exceeds 0.05% of the utility's common equity (see 16 NYCRR 48.1 [b]), we defer to respondent's determination (supported by references to petitioner's rate base and equity ratio) that petitioner's accounting change resulting in an adjustment of more than $1.8 was a material change (see Matter of Council of City of N.Y. v Public Serv. Commn. of State of N.Y., 99 NY2d at 74).
Petitioner contends that, even if this normalization is deemed a major change in accounting, petitioner complied with 16 NYCRR 48.2 because the change was included in petitioner's general rate filing that resulted in the order on appeal. That assertion is not accurate. Petitioner's rate filing did not seek approval for the accounting change; rather, it sought approval to increase petitioner's rates based, in part, on the adjustment related to that accounting change, which petitioner had already unilaterally enacted without prior notice to or approval from respondent. Respondent did not abuse its discretion in refusing to allow an adjustment related to this unapproved change.
Respondent's productivity adjustment is supported by substantial evidence. As a matter of policy, respondent typically imputes by rebuttable presumption a 1% reduction in a utility's labor costs as part of its responsibility to allocate costs and benefits between utility ratepayers and shareholders. The Department proposed applying the traditional 1% adjustment, as well as an additional 1% productivity adjustment to ensure that ratepayers benefit from the efficiencies of petitioner's implementation of its new computer system. Petitioner asserts that it cannot become any more efficient, highlighting evidence of audits demonstrating that petitioner was well managed, cost conscious, consistently provided excellent service and had implemented plans to further enhance its performance. Respondent relied on petitioner's history of efficiency and reasonably concluded that petitioner could be expected to continue to innovate and find increased efficiencies. Hence, substantial evidence supports respondent's determination to disallow the Department's proposed additional productivity adjustment related to the new computer system, but to impose the traditional 1% adjustment because petitioner did not rebut the presumption that it will create productivity gains in the future (see Matter of Ridge Rd. Fire Dist. v Schiano, 16 NY3d at 499; see also Matter of Rochester Tel. Corp. v Public Serv. Commn. of State of N.Y., 87 NY2d at 30-31, 34 [upholding respondent's use of a rebuttable presumption in the ratemaking context]).
Substantial evidence supports the equity ratio adopted by respondent for petitioner's rates. Petitioner argues that respondent has granted every other electric or gas utility in the state a 48% equity ratio, and the 42.9% equity ratio imposed on petitioner constitutes punishment for failing to accept the Department's ring-fencing restrictions [FN2]. Respondent counters that it rationally protected ratepayers against petitioner's attempt to obtain a return on nonexistent equity. At the hearing, staff members testified that petitioner is a wholly-owned subsidiary of a parent company that has four other nonutility business segments and that the parent company's common equity ratio per its June 2016 quarterly report with the US Securities and Exchange Commission is 42.3%. Petitioner is different from other utilities, in that it is the only New York utility that is part of a corporate structure that includes four other nonutility business segments, has a parent corporation that raises capital as a single consolidated entity and is intermingled in that consolidated structure with a high-risk gas and oil exploration/production company from which it is not isolated (see Matter of National Fuel Gas Distrib. Corp. v Public Serv. Commn. of State of N.Y., 107 AD2d 357, 359-361 [1985], affd 66 NY2d 956 [1985]). The testimony explained that where a parent company has financed riskier competitive nonutility operations with less equity than would be necessary for these operations to obtain the same credit rating as the utility subsidiaries, using the subsidiary capital structure would, in effect, "require ratepayers of a lower-risk natural gas distribution company to subsidize its [parent company's] riskier investments," unless the utility subsidiary is insulated from these risks.
Staff members affirmed that it appears that petitioner is subsidizing the parent company's riskier investments because it is not insulated from these risks. Under the corporate structure, petitioner does not issue its own debt; the parent company issues long-term debt for petitioner. At the time of the hearing, however, the parent company was unable to issue new long-term debt due to a significant amount of impairments coming from the parent company's exploration and production business segment and certain debt covenant restrictions. Staff members explained, with citation to a relevant precedent, that respondent has a long-established policy of using the consolidated corporate structure when setting rates of an affiliate utility company. A 42.9% equity ratio (equal to the parent company's equity ratio at the time of respondent's decision) was supported by staff testimony indicating that setting a higher equity ratio than petitioner's corporate parent would improperly support the parent's higher-risk nonutility investments without providing any benefit to ratepayers (see Matter of Ridge Rd. Fire Dist. v Schiano, 16 NY3d at 499; Matter of Home Depot U.S.A., Inc. v State of N.Y. Pub. Serv. Commn., 92 AD3d at 1014; Matter of Spring Val. Water Co. v Public Serv. Commn. of State of N.Y., 71 AD2d 55, 56-57 [1979], lv denied 49 NY2d 706 [1980]).
The earnings sharing mechanism (hereinafter ESM)[FN3] imposed by respondent represents a proper exercise of its authority and does not deny petitioner equal protection. The authority to impose an ESM falls within respondent's general authority to set utility rates that are just and reasonable (see Public Service Law § 66 [5]; Matter of Retail Energy Supply Assn. v Public Serv. Commn. of the State of N.Y., 152 AD3d 1133, 1138 [2017], lv granted 31 NY3d 902 [2018]). The ESM does not constitute retroactive rulemaking but, instead, constitutes an authorized automatic rate adjustment (see Matter of Niagara Mohawk Power Corp. v Public Serv. Commn. of State of N.Y., 69 NY2d 365, 370 [1987]).
Petitioner clarifies that it is not making a constitutional equal protection challenge but is arguing that the ESM constitutes asymmetrical ratemaking in favor of ratepayers, as condemned by the courts. This matter is distinguishable from cases relied upon by petitioner, which involved laws that bound a utility to certain rates for a potentially indefinite time and provided no mechanism for the utility to initiate a proceeding to revise the rates (see Matter of Trustees of Vil. of Saratoga Springs v Saratoga Gas, Elec. Light & Power Co., 191 NY 123, 149-151 [1908]; see also Matter of New Rochelle Water Co. v Public Serv. Commn. of State of N.Y., 31 NY2d 397, 409 n 3 [1972]). Petitioner was not harmed by asymmetrical ratemaking because it may file proposed tariff amendments seeking new rates each year and respondent's order imposed an ESM beginning April 1, 2018 (one year after the rates in the order begin), with the ESM to take effect only if petitioner does not file for new rates by October 1, 2018. Overall, respondent's order was not affected by an error of law and is supported by substantial evidence.
Garry, P.J., Clark, Aarons and Rumsey, JJ., concur.
ADJUDGED that the determination is confirmed, without costs, and petition dismissed.



Footnotes

Footnote 1: Although petitioner expresses concern that the Department will change methods to whichever one provides for less of a rate increase, a staff member testified that the NY-Only method should be consistently used going forward for future rate proceedings. We assume that respondent will hold the Department to this position.

Footnote 2: Ring-fencing is a term for mechanisms that a company adopts to protect it from negative effects of riskier operations of a parent company or its subsidiaries. We disagree with petitioner's assertion that respondent found a ring-fencing scheme to be unnecessary for petitioner. In its order, respondent adopted the Administrative Law Judge's recommendation and instituted a collaborative process requiring the parties to file a report indicating either a consensus recommendation or individual positions addressing the Department's recommendation that corporate structural changes be imposed on petitioner and its affiliates to insulate petitioner from future negative impacts related to their corporate structure.

Footnote 3: As explained by respondent in its order, an ESM "returns to customers a portion of a utility's reported earnings that exceed some threshold set above the utility's allowed [return on equity]."